Jessie R. PRICE, Individually and as Administratrix of the Estate of Nathaniel Price, Lloyd M. Price, Steven D. Price, Robin Cooper, Thurmond W. Price, Rohn D. Price, Dohn Price, Daretta A. Wilmer, and Nathan L. Price, Plaintiffs Below, Appellants,

v.

BLOOD BANK OF DELAWARE, INC., Defendant Below, Appellee.

No. 191,2001.

Supreme Court of Delaware.

Submitted: Nov. 27, 2001.
Decided: Feb. 14, 2002.
Reargument and Rehearing En Banc Denied March 4, 2002.

Stephen P. Casarino (argued) and Thomas P. Leff, Casarino, Christman & Shalk, Wilmington, for Appellant.

James F. Kipp (argued) and William L. Doerler, Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, for Appellee.

Before VEASEY, Chief Justice, WALSH, and HOLLAND, Justices.

WALSH, Justice:

In this appeal from the Superior Court, we address the standards which govern a trial judge's questioning of an expert witness before a jury. The appellant contends that the trial judge's obvious hostility to the witness and the subsequent exclusion, in part, of the expert's testimony prejudiced the standing of the expert in the estimation of the jury. We agree and accordingly reverse and remand for a new trial.

I

This litigation arose from the death of Nathaniel Price, ("Price"), who contracted the HIV virus following a blood transfusion on October 5, 1984 during treatment for acute anemia. The blood in question had been collected and distributed by the Blood Bank of Delaware, Inc. ("Blood Bank"). It is not disputed that the blood administered to Price was contaminated and Price's estate and next of kin filed suit against Blood Bank alleging negligence in the screening and testing of blood donors. Blood Bank contends that it conformed to the screening standards then in effect and breached no duty to Price.

Blood Bank had earlier moved for summary judgment on several grounds, including that it was a health care provider subject to the requirement that expert medical testimony was required to establish its liability. The Superior Court ruled to the contrary and this Court affirmed that ruling. *Blood Bank of Delaware, Inc. v. Jessie R. Price, et al.,* Del.Supr., No. 133, 1999, 748 A.2d 406, Walsh, J. (Feb. 28, 2000) (ORDER). In our order affirming the denial of summary judgment, we noted our disagreement with the Superior Court's observation that the Blood Bank's conduct could be determined by a reasonable person "through the exercise of his or her common sense." *Id.* at 5. Subsequently, at the trial of this matter, both sides presented expert testimony directed to whether Blood Bank properly screened donors for the presence of the HIV virus in 1984. Price contends that in this clash of experts, the trial judge displayed an obvious hostility to his expert that damaged the expert's opinion, in so far as his opinion was permitted to go to the jury. Price also assigns as error the trial court's refusal to instruct the jury that departure from

a Food and Drug Administration regulation constituted negligence *per se.*

Blood Bank has cross-appealed from the trial court's ruling permitting any portion of Price's expert's opinion testimony to be considered by the jury because it lacked a proper foundation. Additionally, Blood Bank cross-appeals from the trial court's refusal to grant it judgment as a matter of law, on the claim asserted by certain of the decedent's children for their failure to appear at trial and present evidence of their damages arising from Price's alleged wrongful death.

## II

The underlying facts giving rise to this litigation are not in serious dispute. Price suffered from acute anemia and was admitted to a local hospital. His physician ordered a blood transfusion, which occurred on October 5, 1984. The transferred blood was collected and distributed by Blood Bank, who had secured the blood from a donor in Dover, Delaware.

It is not disputed that the blood contained the HIV virus, which eventually caused Price's death. The principal issue to be determined at trial was whether the Blood Bank, at the time it collected the blood, had adopted adequate procedures for screening potential donors in light of the scientific knowledge then available for determining the risk of HIV contamination in blood donation. Blood Bank contends that, given the state of knowledge of the risk of transmitting the HIV virus through blood transfusion in 1984, including the absence of a specific test for HIV, its procedures for screening potential donors conformed to the relevant standard of care. Each side presented expert testimony in support of its view of the adequacy of Blood Bank's screening procedures.

Price's evidence in support of its claim of inadequate screening was presented through the testimony of its medical expert, Dr. Theodore Koerner. Dr. Koerner is an associate professor at the University of Iowa medical school, where he teaches hematology and transfusion medicine. He is also an associate medical director of the blood center at that university. He had previously served as medical director of the blood center at Tulane University Hospital. He has written and published extensively in the field of blood banking methodology.

Dr. Koerner testified that beginning in January 1983, the Center for Disease Control, an agency of the federal government, began issuing weekly reports reflecting the incidence of AIDS cases by state, and sometimes by city. He used these reports in his work in New Orleans in 1983 and noted that incidents of AIDS nationwide was uneven, with certain metropolitan areas experiencing AIDS frequency of epidemic proportions, reflective of the high concentration of gay men. His review of the data and his familiarity with Philadelphia, which he often visited, suggested to him that the Pennsylvania data reflected the experience of Philadelphia and its environs. In his opinion, by 1984, blood banks collecting blood in high risk metropolitan areas such as New York and Philadelphia should have taken additional steps beyond Food and Drug Administration (FDA) requirements to determine whether a potential donor might be at high risk for donating HIV-infected blood. Based on his familiarity with the transitory social habits of gay men, Dr. Koerner was of the further view that suburban areas surrounding large urban centers, where there was a high risk of HIV infection, were also subject to an increased presence of HIV in potential blood donors. Based on his general familiarity with Philadelphia, Dr. Koerner thus opined that the entire State of Delaware should have been considered

to share Philadelphia's high risk of HIV contraction and blood banks collecting blood in Delaware should have questioned potential donors to determine their sexual habits.

Although Blood Bank apparently had filed a motion *in limine* seeking to prevent the presentation of Dr. Koerner's opinion testimony, he, in fact, testified on direct examination *before the jury* without preliminary *voir dire* concerning his qualifications and the scientific basis for his views. Dr. Koerner's direct testimony was interrupted on several occasions by the trial judge who asked pointed and sharp questions. Illustrative of that questioning are the following exchanges between the trial court and Dr. Koerner:

A. With respect to this case I went back and looked at that data with respect to this case.

Q. What did the data tell you?

A. It told me that Delaware, being part of the greater Philadelphia metropolitan area -

THE COURT: Wait a minute. Who told you that?

THE WITNESS: That is my opinion based upon having lived in Philadelphia, having, you know, some knowledge of geography and some knowledge of the way that urban centers are organized how the inner city and the suburbs in a city function. You know, that is it is my own experience, if you will.

THE COURT: When did you live in Philadelphia?

THE WITNESS: My mother's family is in Philadelphia. Through my childhood I visited Philadelphia and through my residency training at Yale, I was in Philadelphia at least three or four times a year visiting, driving, experiencing Philadelphia in many, many ways.

THE COURT: How long ago was that?

THE WITNESS: Well, I finished my residency training in 1986. So up through 1986 while I was at—sorry 1982, sorry. 1982. I was at the Yale New Haven Hospital visiting the Philadelphia area.

THE COURT: Based on that you concluded that the entire State of Delaware is part of the Philadelphia metropolitan area?

THE WITNESS: Well, the simple answer would be yes. We could make some fine distinctions about what parts of Delaware but I think that anyone who knows the way urban cities development in America has—even this term being megalopolis that goes from his [sic] Boston down to Atlanta, now urban centers have developed the way that markets have evolved the way that the interstate system has evolved that Delaware is very much a part of the commerce of the Philadelphia area.

MR. KIPP: Your Honor, I move to strike any testimony concerning the epidemic of Philadelphia being part of Delaware. First of all, it is his own personal opinion from having some contact with Philadelphia. Most of us in this room have some contact with Philadelphia. But he started this out by saying he reviewed CDC weekly data. Where is the CDC weekly data he reviewed? He went from that to talking about his mother lived in Philly. That is not a foundation for his opinion.

THE WITNESS: I -

THE COURT: Wait a minute. He is talking to me. Do any of those CDC weekly reports specifically cover the State of Delaware or any portions thereof?

THE WITNESS: Well, during much of the time frame of the AIDS epidemic Delaware is lumped in a group called "other." There were cases reported in

Delaware but they are lumped together in a subcategory called other. My -

THE COURT: Those are not included in Philadelphia, Pennsylvania statistics then?

THE WITNESS: Well, Philadelphia is included in the Pennsylvania.

THE COURT: Talking about Delaware.

THE WITNESS: To my knowledge, no. Delaware ultimately became its own unit reported later on when there were enough cases that the CDC decided to make a separate case.

A further interruption of direct examination occurred immediately after the trial judge permitted Price's attorney to resume direct examination:

BY MR. CASARINO:

Q. In addition to that, Doctor, could you tell us your understanding of the behavior of homosexual men back in 1983 and '84 with regards to larger cities?

THE COURT: Wait a minute. Let's establish some foundation for this knowledge. Not all doctors know how homosexuals move from place to place.

\* \* \*

Later, during Dr. Koerner's direct testimony, when asked whether homosexuals in the Wilmington area, and perhaps in the Dover area, would tend to go to Philadelphia for their night activities; Dr. Koerner replied: "Absolutely. I can remember newspaper articles at the time." At this point there was an objection by defense counsel and the trial court commented "You are saying absolutely. Did you accompany them?" Dr. Koerner, obviously on the defensive, replied:

THE WITNESS: Well, no, well all right. There is an intellectual model that I am proposing here. But, yes, I am aware I am not myself homosexual. I certainly have followed some of the literature about homosexuals in that in Philadelphia, particularly in a period of the early '80s, lots of homosexual activity, very prominent activity that ended up in the news media that was centered in Philadelphia.

Philadelphia was one of the centers of promiscuous gay activity. That's a matter of public record. So it's based on the fusion of those two ideas and then relating it to the CDC data.

Following this answer by the witness, Price's counsel attempted to ask another question but it was interrupted in the following colloquy:

BY MR. CASARINO:

Q. There is an -

THE COURT: Have you ever visited Dover, Delaware. Are you familiar with the culture in Dover.

THE WITNESS: I have been to Dover, Delaware yes. There is a very famous Chinese restaurant I have eaten at many times.

BY MR. CASARINO:

Q. I don't know where we are going in the constant interruptions. Does Mr. Kipp want to *voir dire?*

THE COURT: Mr. Casarino, I have to make a decision to see whether Dr. Koerner is expressing the opinion that you told me he wants to express. And I have to satisfy myself that he has proper foundation to do so. That is why I am *interrupting.*

MR. CASARINO: All right.

After argument by counsel, out of the presence of the jury, the trial judge ruled that Dr. Koerner, despite his "impeccable" qualifications did not have "the expertise to say that the entire State of Delaware has experienced an increased risk of AIDS because it was shown that in the entire State of Pennsylvania there was an increase of AIDS incidents..." and, "there

is no scientific foundation for the conclusions."

Following the ruling striking Dr. Koerner's opinion on the need for additional questioning of Delaware donors in 1984, Dr. Koerner was asked to give a separate opinion regarding the adequacy of the testing actually performed by Blood Bank in 1984. Dr. Koerner acknowledged that prior to March 1985 there was no clinical test for determining the presence of the HIV virus in blood. He asserted, however, that there were two methods available in 1984 for determining whether potential donors were at "high risk" for AIDS. One method, described as surrogate testing, involved testing for the presence of hepatitis B, which shares "a very similar epidemiology with AIDS," between 1982 and 1985. Because individuals with AIDS often were also infected with hepatitis B, testing for the latter disease could prove an effective screening device for the former.

Dr. Koerner also believed that direct questioning, in private, of potential male donors concerning sexual contacts with other males or the use of intravenous drugs was an available method in 1984 for screening blood donors. In his opinion, "any reasonable and prudent blood banker," especially one concerned about being in a high risk area, would have done "either surrogate testing or direct questioning regarding homosexual con-

tact." Despite vigorous cross-examination and objection by opposing counsel, the trial court permitted Dr. Koerner's second opinion regarding surrogate testing and direct questioning to be submitted to the jury as a basis for determining Blood Bank's liability.

In this appeal, Price contends that the trial judge erred in striking Dr. Koerner's first opinion on foundation grounds but, more importantly, Price asserts that the court's hostile questioning of the witness, *in the presence of the jury,* created an atmosphere of disbelief which damaged the expert in the estimation of the jury, who was called upon to evaluate Dr. Koerner's views against the view of Blood Bank's experts, Dr. Jay Menitove and Dr. Harvey Klein.[1] Blood Bank argues that even if the trial judge's questioning of Dr. Koerner showed partiality, such conduct was harmless because even that portion of Dr. Koerner's testimony which did go to the jury was inadmissible as a matter of law because it also lacked a proper scientific foundation.

■ Initially, we note that Price's counsel expressed his concern about the trial judge's hostile questioning at trial and during the conference on jury instructions.[2] We thus review the trial judge's ruling on the admissibility of Dr. Koerner's testimony under an abuse of discretion standard. *M.G. Bancorporation v. LeBeau,* 737 A.2d

---

1. Dr. Menitove testified that Blood Bank's screening procedures in effect in 1984 were "perfectly consistent" with procedures used by blood banks nationwide. He was also of the view that surrogate testing was impractical and could "backfire badly." Another expert witness, Dr. Harvey Klein, also testified on behalf of Blood Bank and was critical of Dr. Koerner's surrogate testing recommendation.

2. Price's counsel apparently was so concerned about the trial judge's hostility that he even objected to the court's giving the stan-

dard instruction on "court impartiality" in the following unusual exchange.

> MR. CASARINO: I object to that.
> THE COURT: Court impartiality? I can change it around. Look folks, the Blood Bank has a terrific case here.
> MR. CASARINO: You told them that the way you cross-examined my expert.
> THE COURT: I guess after 15 years I am having some difficulty with water running uphill in my courtroom. If you sense that was the case, it is all the more important I should give that.

513, 522 (Del.1999). Our review of this unusual case, however, entails not only the substance of the ruling on admissibility, but the manner in which it was formulated.

### A.

Expert testimony must be both relevant and reliable in order to be admissible. *M.G. Bancorporation v. LeBeau,* 737 A.2d 513, 521 (Del.1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Both an expert's methodology and ultimate conclusion must be reliable. *M.G. Bancorporation,* 737 A.2d at 522. An expert's testimony must have a reliable basis in the knowledge and experience of the relevant discipline. *Id.* at 523. To be reliable, testimony "must be based on the methods and procedures of science, rather than subjective belief or speculation." *In re TMI Litigation,* 193 F.3d 613, 669 (3d Cir.1999).

D.R.E. 702 states: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Although this Court is not bound by the United States Supreme Court's interpretation of the comparable Federal Rule of Evidence 702, this Court has adopted the holdings of the Supreme Court in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) as the correct interpretation of D.R.E. 702. *See M.G. Bancorporation, Inc.,* 737 A.2d at 521. D.R.E. 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Id.* In addition, the Superior Court should act as the gatekeeper to all expert testimony and

must decide if the expert's testimony "has a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 523.

The expanded role of the trial judge as "gatekeeper" also carries with it a heightened requirement of impartiality whenever the trial judge engages in direct questioning of an expert witness. D.R.E. 614(b) permits the court to interrogate witnesses "whether called by itself or by a party," but in engaging in that task the judge is bound by the Code of Judicial Conduct, which mandates that he be "patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity...." Del.Code of Judicial Conduct, Canon 3A.(3). The need for the trial judge to exhibit impartiality is particularly important where the judge, as here, engages in direct questioning of a witness in the presence of the jury, who may later be called upon to evaluate the credibility of the expert.

The need for a judge to exercise self-restraint and preserve an atmosphere of impartiality in the questioning of an expert witness arises from the judge's absolute duty of neutrality. Departure from that rule may be grounds for reversal on the basis of plain error. In *Rocha v. Great American Ins. Co.,* 850 F.2d 1095 (6th Cir.1988), the Court reversed a jury verdict, holding the verdict was "tainted by biased commentary and interjection" by the trial judge who questioned plaintiff's expert witness. Although the appellate court noted that a reasonable jury could have found in favor of the defendant on the evidence presented, the plaintiff was "entitled to present his evidence to a fair and impartial tribunal." *Id.* at 1101.

Even though a trial judge may instruct the jury through routine instructions that

he is impartial; his conduct in the dynamics of the trial may suggest the contrary. As one appellate court commented:

> By reason of his role, quickly observed by jurors, the judge is a figure of overpowering influence, whose every change in facial expression is noted, and whose every word is received attentively and acted upon with alacrity and without question.

*Travelers Insurance Co. v. Ryan,* 416 F.2d 362, 364 (5th Cir.1969).

■ State trial courts, with rules substantially the same as D.R.E. 614, have invalidated the biased and excessive interrogation of witnesses by the trial judge in the presence of the jury. For example, in *Block v. Target Stores, Inc.,* the Minnesota Court of Appeals found that the extensive cross-examination conducted by the trial judge of plaintiff's expert witness was even more disquieting than the judge's sarcastic comments toward plaintiff. *Block v. Target Stores, Inc.,* 458 N.W.2d 705, 713 (Ct. App.Minn.1990). Noting that Minn. R. Evid. 614(b) authorizes the interrogation of witnesses by the court, the Appeals Court stated "this prerogative ... should be exercised with great caution, particularly when the credibility of key witnesses is at issue." *Id.* The Court went on to explain that trial judges must use extreme caution when questioning witnesses due to "the recognized extraordinary prestige of the trial judge." *Id.* Thus, during trial, a judge must not "desert the high position to which the judge is elevated, and assume the role of the advocate." *Id.*

Apart from the potential for undue influence, an activist judge who takes over the cross-examination of a witness places counsel presenting that witness in an untenable position. In order to protect the record and preserve any claim of impermissible intervention, counsel would be inclined to register an objection to the judge's conduct. But to do so in the presence of the jury places counsel in the perilous position of appearing to be critical of the court. In this case, counsel felt so strongly about what he considered interference of the court that he reserved his strongest objection for the prayer conference, as reflected in the colloquy set forth above.

Price contends the trial judge's questioning of Dr. Koerner was rude and overbearing. We cannot determine rudeness from the record before us but the trial judge's questioning was aggressive and pointed. It is also clear that the trial judge interrupted both counsel and the witness abruptly and his questions carried a tone of skepticism.

■ If the judge's activism in this case had led merely to the striking of Dr. Koerner's testimony in its entirety, then that conduct, though not to be condoned, could be subject to a harmless error analysis, as Blood Bank argues. By permitting the jury to consider and weigh the balance of Dr. Koerner's testimony on the standard of care against the contrary opinions of Blood Bank's expert witnesses, Dr. Menitove and Dr. Klein, however, the trial judge tipped the scale of credibility against the plaintiff in a critical factual determination.[3] That conduct cannot, in the context of the case, be deemed harmless. In our view it represents an abuse of discretion which requires the grant of a new trial.

■ The expanded role of the trial judge as gatekeeper of expert testimony under the *Daubert/Kumho Tire* standards

---

**3.** The trial judge himself viewed Dr. Koerner's credibility as the key to establishing Blood Bank's liability. In concluding the prayer conference, the judge advised Price's counsel that: "If the jury buys into your expert's testimony that the standards were deficient, you win. That is what the focus of this case has been on." (B–56)

requires that certain procedures be followed to ensure an orderly and impartial presentation of expert testimony. First, motions directed to the admissibility of expert testimony should, where practical, be considered through motions *in limine* prior to trial. This requirement should not prove onerous since discovery requirements require full disclosure of the identity of experts and the substance of their proposed testimony. Second, *voir dire*, or preliminary examination based on objections, should take place out of the presence of the jury. Finally, the questioning of the expert by counsel on direct and cross-examination should occur prior to the court's questioning. The trial judge is, of course, free to interrupt for clarification purposes but the trial judge's questions should supplement, not supplant, the questioning of counsel. Finally, as this case demonstrates, the judge's participation must be conducted with patience and courtesy. Judges expect counsel, appearing before them, to conduct themselves with civility, but civility is a two-way street. The judge's duty of civility is not limited to his duty to simply maintain decorum, it also extends to his role as gatekeeper of the evidence.

 The peremptory fashion in which the trial judge rejected Dr. Koerner's initial opinion on the ground that it lacked a scientific foundation, also invalidates the substance of that ruling and thus we do not deem that ruling the law of the case for retrial purposes. *See Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181–82 (Del. 2000). Our ruling, however, does not preclude future rejection of that opinion if, as a matter of law, it fails the joint test of relevancy and reliability.

### III

Our ruling reversing the judgment of the Superior Court and remanding for a new trial renders moot the need to decide other case dispositive issues pending before us. But for the guidance of the trial court in the event of a retrial, we address other relevant issues in summary fashion.

Price requested that the jury be instructed that if it determined that Blood Bank violated a federal regulation governing blood donor screening, it should find such violation negligence *per se*. Specifically, Price relied upon 21 C.F.R. § 640.3(b)(6) which provides in relevant part that "donors shall be in good health, as indicated in part by: ... (6) Freedom from any disease transmittable by blood transfusion, insofar as can be determined by history and examination included above." Under the provisions of § 640.3(b)(1–5), the examination should establish a normal temperature, blood pressure within a normal range, a specified blood hemoglobin level, freedom from acute respiratory diseases, and freedom from infectious skin disease.

Blood Bank objected to the giving of the proposed instruction on negligence *per se* on the ground that there was no evidentiary support for a showing of a violation of a federal regulation. The trial court refused to give the proposed instruction on the basis that the negligence *per se* issue might cause confusion by "allowing the jury maybe to infer some kind of strict liability." At oral argument before this Court, Blood Bank conceded that the trial court was incorrect in rejecting the instruction because of possible implications of strict liability, but nonetheless contends that there was no basis in the trial record for positing liability on the violation of a federal regulation.

 It is long-settled Delaware law that the violation of a statute, or regulation having the force of statute, enacted for the safety of others is negligence in law or

negligence *per se*. *Toll Brothers Inc. v. Considine*, 706 A.2d 493 (Del.1998). Even in the absence of statutory enactment, however, certain regulatory standards or practices may constitute evidence of negligence. *Delaware Elec. Coop., Inc. v. Duphily*, 703 A.2d 1202 (Del.1997).

■■■■ In *Sammons v. Ridgeway*, 293 A.2d 547 (Del.1972), this Court recognized that the concept of negligence *per se* may extend to state administrative regulations as well as statutory enactments. Violations of federal administrative regulations have also been recognized as actionable on a negligence *per se* basis if underlying state law so permits. *Stanton by Brooks v. Astra Pharmaceutical Products, Inc.*, 718 F.2d 553 (3rd Cir.1983); *Orthopedic Equip. Co. v. Eutsler*, 276 F.2d 455, 461 (4th Cir.1960). Establishment of negligence *per se* through violation of a federal administrative regulation, standing alone, does not establish liability. There must be proof of proximate cause, *i.e.*, that the violation of the regulation was a proximate cause of the plaintiff's injury. *Stanton*, 718 F.2d at 564. As applied here, plaintiff is entitled to a negligence *per se* instruction if he establishes a factual basis for causation. Given the general language of the FDA protocol for screening donors, that may prove difficult; but we leave that matter to the presentation of evidence in the event of a retrial.

## IV

Blood Bank has cross-appealed on three grounds, only one of which requires determination in the event of a retrial.[4]

■■■ At trial, Blood Bank moved for judgment as a matter of law against three

children of Price: Thurmond Price, Dohn Price, and Daretta Wilmer. Blood Bank argued at trial and asserts on appeal that these three plaintiffs are barred from recovering damages in this wrongful death suit because they failed to appear at trial or produce any evidence of damages attributable to their father's death. Thus, any award of damages to them would be based on speculation. Price responds that since other family members offered testimony about the losses suffered by the entire family, the jury had sufficient evidence upon which to determine plaintiffs' losses without speculation.

If Price's children were to recover damages under the wrongful death statute this suit was their only opportunity because 10 *Del. C.* § 3724(e) provides that "[o]nly 1 action under the subchapter lies in respect to the death of a person." An action under the wrongful death act can be brought either by the personal representative "for the benefit of" the wife, husband, parents, and child of a deceased person or by the named beneficiaries themselves. *Johnson v. Physicians Anesthesia Service, P.A.*, 621 F.Supp. 908, 915 (D.Del.1985). In determining the amount of damages in a wrongful death action, "the court or jury shall ... fix the award at such sum as will fairly compensate for the injury resulting from the death." 10 *Del. C.* § 3724(d). The jury or court should consider various factors, including deprivation of expected pecuniary benefits and loss of parental services. *Id.* The trial judge correctly rejected Blood Bank's motion on the ground that other siblings confirmed the close relationship among family members. The absence of direct testimony by each plaintiff goes

---

4. Blood Bank's harmless error claim concerning the trial judge's questioning of Dr. Koener has already been addressed and we find no error in the trial judge's refusal to specifically instruct the jury on the "reasonable probability" standard for admissibility of expert testimony.

**1214**

to the weight of the evidence, not to its admissibility.

The judgment of the Superior Court is REVERSED and this matter is RE-MANDED for a new trial consistent with this opinion.