IN THE SUPREME COURT OF THE STATE OF DELAWARE

JOSHUA CIRWITHIAN, §
§ No. 111, 2020
Defendant Below, §
Appellant, § Court Below: Superior Court
§ of the State of Delaware
v. §
§ Cr. ID Nos. N1812006782
STATE OF DELAWARE, § N1812014043
§
Plaintiff Below, §
Appellee. §

Submitted: March 3, 2021
Decided: May 6, 2021

Before **SEITZ**, Chief Justice; **VAUGHN** and **MONTGOMERY-REEVES**, Justices.

# O R D E R

On this 6th day of May 2021, upon consideration of the parties' briefs and the record on appeal, it appears that:

(1) The Defendant-Appellant, Joshua Cirwithian ("Cirwithian"), was found guilty of sexual offenses against two minors, S.C. and S.R., following a bench trial in the Superior Court. He presents five claims on appeal. First, he claims the trial judge committed plain error by assisting and coaching S.C. during her testimony in violation of his obligation to act as a neutral arbitrator. His second claim relates to text messages which the defendant sent to S.C. via Facebook. Cirwithian claims that the trial judge committed plain error by allowing the prosecutor to ask S.C.

repeatedly what was in the defendant's mind and what the defendant meant in each message. His third claim is that the trial judge erred by finding that the evidence was sufficient to support a guilty verdict on the charge of Sexual Abuse of a Child by a Person in a Position of Trust, Authority or Supervision in the First Degree. His fourth claim is that the trial judge committed plain error by allowing the prosecutor, in her summation, to shift the burden of proof to the defendant and vouch for S.C.'s credibility. His final claim is that the trial judge committed error at his sentencing by taking into account a 2003 rape charge against Cirwithian which was *nolle prossed* due to a lack of prosecutive merit.

(2) On December 27, 2018, Cirwithian was arrested for the sexual offenses involved in this case. He was indicted on three counts of Sexual Solicitation of a Child, one count of Unlawful Sexual Contact Second Degree, and one count of Sexual Abuse of a Child by a Person in a Position of Trust, Authority, or Supervision in the First Degree. S.R was the alleged victim in one of the counts of Sexual Solicitation of a Child. S.C. was the alleged victim in all other counts. The State entered a *nolle prosequi* on the charge of Unlawful Sexual Contact Second Degree before trial. Cirwithian waved his right to a jury trial and the case proceeded to a three-day bench trial.

(3) S.C.'s testimony at trial can be summarized as follows. Cirwithian is her uncle. She has known him all her life. She looked up to him, and at times she

2

confided in him. Cirwithian inappropriately touched S.C. on or about August 1, 2016 when she was sixteen. Cirwithian came into her bedroom, asked her about her sex life, made her take off her clothes, and called himself her doctor. Cirwithian put his hand inside S.C.'s vagina for approximately five minutes and told her that she had a sexually transmitted disease. Cirwithian then gave S.C. a bag of pills and instructed her to take them before leaving her bedroom. S.C. did not tell anyone after this incident occurred. This incident is the basis for one of the Sexual Solicitation of a Child charges involving S.C. and the charge of Sexual Abuse of a Child by a Person in a Position of Trust, Authority or Supervision in the First Degree.

(4) Following the above-described incident, but on the same day, Cirwithian messaged S.C. over Facebook messenger. A number of messages then went back and forth between S.C. and Cirwithian. Some of these messages were read aloud at trial during S.C.'s testimony. In one message Cirwithian said "u will be getting a check up by Dr. Josh every week until it goes away[.]"[1] In another he said that "I need what u got so I can give it to her[,]"[2] referring to an ex-girlfriend who he believed had committed some wrong against him. Cirwithian also offered to pay S.C. if she would help him. As the prosecutor went through the messages with S.C. during her testimony, the prosecutor frequently asked S.C. what she

---

[1] App. to Appellee's Ans. Br. at B38 [hereinafter B__].
[2] B39.

3

understood Cirwithian's messages to mean. S.C. explained that she understood Cirwithian's messages to mean that he wanted to get her to have sex with him or let him touch her vagina with his hands. Defense counsel did not object. The Facebook messages are the basis for the second Sexual Solicitation of a Child charge involving S.C.

(5)     S.C. also testified that she first called the police in the summer of 2017 after a confrontation with Cirwithian at her house. When she attempted to inform the police officer about Cirwithian's sexual abuse, the officer told S.C. that she would have to file a police report.

(6)     S.C. further testified that she went to the Wilmington Police Station and filed a report in January of 2018 after learning that Cirwithian had also sexually abused S.R. In March, S.C. was interviewed by Wilmington Police Detective Simonds. In a videotaped statement, played at trial, S.C. described how Cirwithian touched her in her bedroom during the August 1 incident.[3]

(7)     At the time of trial, S.C. was twenty years old. During defense counsel's cross-examination of S.C., she became frustrated by the questions. The

---

[3] S.C. also testified, without objection, about two incidents of uncharged conduct. She testified that when she was twelve years old, Cirwithian inappropriately touched her for the first time. He touched her chest and buttocks outside her clothing in the hallway where she lived. S.C. also testified about an incident which occurred sometime after the August 1 incident. One day she asked Cirwithian for a ride to a friend's house. On the way they stopped at Canby Park. Cirwithian told S.C. to get in the back seat so he could check on her. S.C. told Cirwithian she was bleeding, so he told her to get back in the front seat. Cirwithian then said that he did not have enough time to drop S.C. off at her friend's house, so he drove her back to her mom's house.

judge explained that although "the questions may seem irritating, irrelevant, not to the point[,]" defense counsel's "goal, at this point, is to try what is known as impeach you; hence, to attack your credibility."[4] The judge told S.C. that "as uncomfortable as it may be, he gets to ask those questions, and you are going to have to answer them."[5] S.C. said that defense counsel's questions are "making me very upset, and to the point I am going to leave."[6] The judge responded, "I understand. But you should not do that, and I encourage you not to do that."[7] A few questions later, defense counsel asked S.C. about a time she went to a clinic. The State objected. S.C. began answering before the judge ruled on the objection, but the judge cut her off and said "[t]rust me, you don't want to say too many things because – just wait."[8] S.C. answered the question anyway, "I went to the clinic for a Plan B. Does that help?"[9] After more questions, S.C. asked "[c]an I see you one second? Can I bring something up?"[10] The judge responded, "[w]hen the State comes back up, keep it in your mind; when the State comes back up."[11] Later, S.C. was frustrated by another question. The judge explained that she "just ha[s] to answer the questions. The State will get an opportunity to do what is known as resuscitate

---

[4] App. to Appellant's Op. Br. at A112 [hereinafter A__].
[5] *Id.*
[6] A114.
[7] *Id.*
[8] A119.
[9] *Id.*
[10] A125.
[11] *Id.*

you. . . It actually is worse if you don't answer, and then something comes out that you didn't answer. So just answer truthfully, and the State will get its opportunity."[12] At no time did defense counsel object.

(8) S.R.'s mother testified about the incident involving S.R. Her testimony can be summarized as follows. She had known Cirwithian since she was eighteen and they used to be in a romantic relationship. After their relationship ended, they remained close friends. She could always depend on Cirwithian. He was like S.R.'s unofficial father. Cirwithian had bought diapers and Christmas gifts for S.R. He had also taken S.R. to get her nails done, to soccer games, and to cheerleading. S.R. revealed to her an incident of inappropriate touching by Cirwithian in January 2018. The incident occurred the previous October. S.R.'s school required that the students wear uniforms. On the day of the incident, S.R. went to school in her uniform, but at the end of the school day, she changed into a short skirt she had taken to school with her. When she got home, her mother saw the skirt and thought it was unacceptably short. Cirwithian arrived at the mother's house about that time, and S.R.'s mother asked him to speak to her about the inappropriateness of the short skirt. When S.R. revealed the incident to her mother, S.R. explained that Cirwithian came into her bedroom to talk about her skirt and told her to undress. After S.R. took her clothes off, Cirwithian told her to lay on the

---

[12] A137.

bed and open her legs because he could tell if she was having sex with someone by looking at her. After hearing this from S.R. in January 2018, S.R.'s mother called S.C.'s mother because she remembered seeing something on Facebook. They spoke with one another and, later that weekend, took S.C. and S.R. to the police station to report the incidents.

(9) S.R.'s testimony can be summarized as follows. She used to look up to Cirwithian as a father figure and used to call him dad. One day, her mother thought her skirt was too short. Her mother told her to go to her room. She did so and a cousin was in the bedroom with her. Cirwithian went to S.R.'s bedroom and asked her cousin to leave the room. Cirwithian then said he could tell if she was having sex and told S.R. to take her clothes off. S.R. took off her shirt and skirt. Cirwithian then asked S.R. to take her bra and panties off. She refused, so Cirwithian told her to put her clothes back on and said that "[w]hatever happens in this room, stays in this room."[13] S.R. was 14 years old at that time.

(10) At the conclusion of trial, the court found Cirwithian guilty on all four counts. The State moved to declare Cirwithian an habitual offender. The court granted the motion. In sentencing comments, the prosecutor discussed aggravating factors:

> In this case, Your Honor, there are multiple aggravators that the Court should consider for sentencing. First and

---

[13] B91.

foremost, there are multiple child victims in this case. The familial relationships include that of an uncle via [S.C.], and as you heard during trial, he – she saw him as the cool uncle. She trusted him. She went to him for advice.

With regard to [S.R.], she said that he was the only dad she knew and she did call him "dad" while she was growing up.

I would note that during the trial we did hear conduct – about conduct that the defendant did to [S.C.] that was uncharged. That should also be considered at the sentencing phase. And that was conduct where [S.C.] was 12 years old and he groped her in an old house and conduct that is subsequent to the charged conduct is that when he was driving her to a friend's house, he again asked to check her and digitally penetrate her in the area of Canby Park when they were in his car.

There is prior criminal conduct that should be considered at this phase. The defendant has a felony gun conviction from Virginia. There is also a prior rape allegation in 2003. That prior rape allegation involved a stranger rape. The allegation was from an 18-year-old at the time in 2003.

When the DNA was tested in 2010, it revealed a match to the defendant. Due to the prosecuted merit, the charges were nolle prossed. That allegation should be considered at this phase.[14]

Defense counsel did not object. However, defense counsel did address the prior rape allegation in his argument:

The other thing that the State pointed out that I wanted to note was the prior accusation of rape. Again, as the State

[14] B156-57.

in full candor noted to the Court, the case was dismissed off of prosecutive merit. I know nothing about the case beyond that, but I would suggest that when the State chooses to charge someone and then chooses to dismiss the case based off the merit and doesn't allow that person the opportunity to fight the case, to present evidence that they – that it would be inappropriate to later on use that as an aggravating factor.[15]

The court explained the sentence imposed with the following comments:

The Court has read the file inside and out. The Court has obviously presided over the case at trial. The Court has heard statements from at least one of the victims in this case, the mother of one of the victims in this case. The Court has read the PFE, considered the mitigation as outlined by the State and clarified or corrected by the defense. The Court has considered the aggravating factors in this case and the Court finds that those aggravating factors significantly outweigh the mitigating factors. And the Court highlights the fact that we're talking about two child victims, separate child victims.

The MO in this case, motus operandi, was eerily similar. Both individuals looked to you, sir, as either a father figure or uncle or someone that they can trust. That's the – among the other aggravating factors, that's the one that stood out to the Court the most. Obviously there's your felony record that the Court looked into, or looked at, rather, in structuring the sentence.[16]

(11) The court sentenced Cirwithian to 70 years' incarceration at supervision level V, suspended after 24 years.

(12) Cirwithian's first claim is that the trial judge assisted and coached S.C.

---

[15] B171-72.
[16] B181-82.

9

during her testimony in breach of his obligation to be a neutral arbitrator. As mentioned, defense counsel did not object at trial. Where defense counsel did not object at trial to issues now raised on appeal, this Court reviews for plain error.[17] To constitute plain error:

> [T]he error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.[18]

(13) Cirwithian argues that the trial judge's conduct was an abuse of discretion and a violation of his confrontation rights and right to a fair trial under the United States and Delaware Constitutions. In support of his contention, Cirwithian cites *Buckham v. State*[19] and *Price v. Blood Bank of Delaware, Inc.*[20] After a careful reading of both cases, it is apparent that they are inapposite. Neither case can support a conclusion that the trial judge's statements to S.C. amount to plain error. Both of those cases involved jury trials. Both of those cases were also reviewed under a less-stringent standard than plain error. The facts of those cases are also markedly different than those involved here. The type of "coaching" that

---

[17] *Small v. State*, 51 A.3d 452, 456 (Del. 2012).
[18] *Small*, 51 A.3d at 456 (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).
[19] 185 A.3d 1 (Del. 2018) (en banc).
[20] 790 A.2d 1203 (Del. 2002).

occurred in *Buckham* was between the witness and that witness's own counsel in the middle of cross-examination. That coaching caused the witness to significantly change his testimony. The trial judge here did nothing like that. In *Price*, the Court concluded that a judge's hostile questioning of a witness in front of the jury tainted that witness's credibility. However, here, the judge's statements had no potential to impact a jury because there was none. The record shows that S.C. was frustrated and to some extent tried to fight the defense attorney's questions. The trial judge simply explained to her the necessity that she answer each question posed. The judge did not suggest any answers. Cirwithian has simply failed to demonstrate that the judge committed plain error.

(14) Cirwithian's second claim is that the court committed plain error by allowing the prosecutor to ask S.C. what she thought Cirwithian meant in the Facebook messages from him without her having personal knowledge of what Cirwithian meant, in violation of D.R.E. 602. That rule states that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[21] Because no objection was made at trial, this argument is reviewed under the same plain error standard explained above.

(15) Cirwithian mischaracterizes the prosecutor's questions. The

---

[21] D.R.E. 602.

prosecutor did not ask S.C. what Cirwithian meant in his messages. The prosecutor asked S.C. what she understood the messages to mean, or, in other words, what S.C. interpreted Cirwithian's messages to mean. A review of the transcript of S.C.'s testimony leads us to conclude that S.C.'s answers to this line of questioning add little or nothing to the inferences a trier of fact would readily draw from the contents of the messages themselves, without the assistance of S.C.'s explanations. There is no plain error here.

(16) Cirwithian's third claim challenges the sufficiency of the evidence to find that he was in a position of trust concerning S.C. "Where a defendant claims his conviction was based upon insufficient evidence, the standard of review is whether the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt."[22] "In making that determination, we review the evidence *de novo*."[23]

(17) Under 11 *Del. C.* § 778:

> A person is guilty of sexual abuse of a child by a person in a position of trust, authority or supervision in the first degree when the person:
>
> . . . .

---

[22] *Carter v. State*, 933 A.2d 774, 777 (Del. 2007) (citing *Poon v. State*, 880 A.2d 236, 238 (Del. 2005)).

[23] *Id.* (citing *Cline v. State*, 720 A.2d 891, 892 (Del. 1998)).

(2) Intentionally engages in sexual penetration with a child who has not yet reached that child's own sixteenth birthday and the person stands in a position of trust, authority or supervision over the child, or is an invitee or designee of a person who stands in a position of trust, authority or supervision over the child.[24]

The phrase "position of trust, authority or supervision over a child" is defined in 11 *Del. C.* § 761(e). That section includes seven subsections, two of which, (1) and (7), are relevant to the parties' arguments:

"Position of trust, authority or supervision over a child" includes, but is not limited to:

(1) Familial, guardianship or custodial authority or supervision; or

(7) Any other person who because of that person's familial relationship, profession, employment, vocation, avocation or volunteer service has regular direct contact with a child or children and in the course thereof assumes responsibility, whether temporarily or permanently, for the care or supervision of a child or children.[25]

Cirwithian argues that subsections (1) through (6) are not applicable to this case, and that neither of subsection (7)'s requirements of regular direct contact with S.C. or assuming responsibility for care or supervision of S.C. is supported by the evidence.

(18) In its summation, however, the State relied upon § 761(e)(1), not §761(e)(7). The prosecutor argued, in part:

---

[24] 11 *Del. C.* § 778.
[25] 11 *Del. C.* § 761(e).

> The definition of "position of trust" is found at Section 761(e)(1), and it is authority or supervision, which includes familial authority.
> How do we get there?
> [S.C.] told us that she trusted her uncle.
> She looked up to him;
> She got advice from him.[26]

S.C. testified that Cirwithian was her uncle; she has known him all her life, looked up to him, and loved him; and she could confide in him when she was having problems in school or with her father. We think that the evidence of the relationship between Cirwithian and S.C. was sufficient to permit a finding that the State satisfied its burden of showing that Cirwithian stood in a position of familial authority over S.C.

(19) Cirwithian's fourth claim is that the trial judge committed plain error by allowing the prosecutor to shift the burden of proof and vouch for S.C.'s credibility in the State's summation. This burden shifting and vouching, Cirwithian argues, occurred when the prosecutor, during the State's argument, asked "[w]hy would S.C. make this story up?"[27] Like Cirwithian's first and second arguments, because no objection was made at trial, we review for plain error.

(20) S.C.'s credibility was an issue at trial, and the prosecutor's question was in the context of an otherwise unobjectionable argument. It may perhaps have

---

[26] A166.
[27] A165.

been better form if the prosecutor had argued that the trier of fact, the judge, should ask himself why S.C. would fabricate such an accusation, but the argument as made stops short of a personal endorsement by the prosecutor of S.C.'s credibility beyond what could be inferred from the evidence.[28]  It also stops short of an assertion by the prosecutor that S.C. was truthful, correct, or right.[29]  There is no plain error here.

(21)  Last, Cirwithian argues that the court erred by considering the State's argument at sentencing that the arrest for the alleged 2003 rape, which was *nolle prossed*, should be considered.  When reviewing a lower court's sentence:

> It is well-established that appellate review of sentences is extremely limited.  Our review of a sentence generally ends upon a determination that the sentence is within the statutory limits prescribed by the legislature.  If the sentence falls within the statutory limits, we consider only whether it is based on factual predicates which are false, impermissible, or lack minimal reliability, judicial vindictiveness or bias, or a closed mind.[30]

(22)  The record does not show that the sentencing judge relied on the dismissed 2003 rape charge in deciding what sentence to impose.  In its sentencing

---

[28] *Whittle v. State*, 77 A.3d at 243 ("'Improper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness testified truthfully.'  Therefore, prosecutors generally cannot vouch for the credibility of a witness by stating or implying personal knowledge that the witness' testimony is correct or truthful." (citations omitted)).

[29] *Id*. at 246 (concluding that the prosecutor "undoubtedly improperly vouched for the credibility of certain witnesses when he repeatedly asserted that various key witnesses were 'right[,]'" and amounted to plain error).

[30] *Perry v. State*, 2020 WL 3069498, at *1 (Del. Jun. 9, 2020) (citations and quotations omitted).

comments, the court discussed a number of factors it considered, but makes no specific mention of the 2003 rape charge. Cirwithian cannot show that his sentence was based on improper factual predicates. His claim is, therefore, rejected.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:


/s/   James T. Vaughn, Jr.
Justice