Earl Dean LILLY, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 120, 1993.

Supreme Court of Delaware.

Submitted: Sept. 13, 1994.
Decided: Nov. 28, 1994.

Louis B. Ferrara, Aerenson, Ferrara & Lyons, Wilmington, for appellant.

Gary A. Myers (argued), Dept. of Justice, Georgetown, and William L. George, Jr., Dept. of Justice, Wilmington, for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ. (constituting the Court *en Banc*).

HOLLAND, Justice:

Following a jury trial in the Superior Court, the defendant-appellant, Earl Dean Lilly ("Lilly"), was convicted of Murder in the Second Degree. Lilly's motion for a new trial was denied. This is Lilly's direct appeal.

Lilly raises three claims of error in this appeal. First, he contends the Superior Court erred in not declaring a mistrial because the State did not produce the transcribed statements of several witnesses until the date of trial. Second, he contends the Superior Court made several erroneous evidentiary rulings. Third, he contends the Superior Court erred by not instructing the jury on the lesser-included offense of Vehicular Homicide.

We find Lilly's first two contentions without merit. Although Lilly's third contention is legally correct, the record reflects that the error in instructing the jury was harmless beyond a reasonable doubt. Therefore, the judgments of the Superior Court are affirmed.

## Facts

Patricia Motter ("Motter") was driving her car on the night of May 17, 1991, when she was involved in a collision. The collision occurred at approximately 11:00 p.m. on a concrete bridge on Otts Chapel Road. The bridge was located between the Otts Chapel Road intersection and the entrance to the Sandy Brae Industrial Park.

At the same place and time, Lilly was driving on Otts Chapel Road. He had been drinking and was travelling at a high rate of speed. Lilly lost control of his vehicle on the bridge. Two witnesses saw Lilly's vehicle strike the concrete bridge wall, but neither saw the Motter and Lilly vehicles collide.

Police from the City of Newark arrived at the scene by 11:12 p.m. They found Motter's vehicle resting against the concrete bridge wall. Motter and Lilly were taken to the Christiana Hospital. Motter was pronounced dead-on-arrival at the hospital. It was determined that Lilly's blood alcohol content was .11.

The police took four witnesses, Stephen Brzozowski, Grace Szafranski, Karen Lutte, and Jessica Brown, to the Newark Police Station. The witnesses gave recorded statements concerning their observations that night.

Brzozowski and Szafranski recounted that they had been in a motor vehicle at the entrance to the Sandy Brae Industrial Park, waiting to turn right onto Otts Chapel Road. Lilly's vehicle and a second vehicle passed in front of them travelling northbound, towards the bridge, at high speeds. Brzozowski and Szafranski arrived on the bridge soon after the cars passed. There, they observed the damaged Lilly and Motter vehicles at rest. They did not see the cars collide.

At the same time, approaching the bridge southbound were witnesses Brown and Lutte. According to Lutte, she saw the Lilly vehicle jump the median, spin and collide with the bridge wall. Lutte stated that she never saw the Lilly vehicle strike any other car. Brown also gave a recorded statement that coincided with Lutte's statement in all respects.

The State charged Lilly with Murder in the Second Degree, alleging that he:

did recklessly and under circumstances manifesti[n]g a cruel, wicked and depraved indifference to human life cause the death

of Patricia A. Motter, by driving while under the influence of alcohol and at a high rate of speed and as a result he lost control of his automobile and collided *headon* [sic] with the automobile driven by Patricia A. Motter. (emphasis added).

After indictment and before trial, the State provided Lilly's defense counsel with a copy of the Newark Police report, which erroneously summarized the observations of Lutte and Brown as follows: "Lutte and Brown were traveling [east-bound] and were able to see vehicle # 2 [the Motter vehicle] at the time of the accident."

At trial, the State called witnesses Brzozowski, Szafranski, Lutte and Brown. Their May 18, 1991 statements were provided to defense counsel on the morning of trial, May 18, 1992. The testimony of all four witnesses was consistent with their May 18, 1991 statements.

The State presented witnesses who testified that they saw Lilly speeding in the town of St. Georges not long before the collision with Motter. One witness stopped Lilly in St. Georges, saw that Lilly had been drinking, and tried unsuccessfully to have Lilly surrender his car keys. Another witness called "911" to report Lilly's erratic driving in and around St. Georges.

Lilly left St. Georges with a friend, Tyrone Johnson, as a passenger. Johnson was riding with Lilly at the time of the collision with Motter. Lilly also testified that after picking up Johnson in St. Georges, he continued to drink beer. Lilly testified that he was probably driving 75 or 80 miles per hour when he approached the curve before the concrete bridge where the collision occurred. At trial, Lilly also acknowledged that several years ago, he had attended classes concerning the dangers of drinking and driving.

The State also offered the testimony of two accident reconstruction experts at trial. The experts were Corporal Theodore Ryser of the Newark Police Department and Corporal Joseph A. Maichle of the New Castle County Police Department. The State's experts opined that Lilly lost control of his vehicle, jumped the median and struck the Motter vehicle head-on, in Motter's lane, as she entered the bridge from the direction opposite to Lilly.

### *"Brady Material"*
### *Recorded Statements*

■ Lilly's first argument is that the State violated its obligation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*"Brady"*). The *Brady* doctrine requires disclosure of "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197). Thus, when a violation of the *Brady* rule is alleged, two questions must be addressed: "First, was the non-disclosure at issue a violation of *Brady?* Second, if the non-disclosure was contrary to the dictates of *Brady,* what was the nature of the error?" *Michael v. State,* Del.Supr., 529 A.2d 752, 755 (1987).

According to Lilly, the prosecutor violated *Brady* by waiting until the day of trial to provide defense counsel with transcripts of the recorded statements the police obtained soon after the accident. When the witnesses' statements were produced, Lilly's attorney moved for a mistrial, arguing the State should have disclosed the statements earlier.

Lilly asserts on appeal that the recorded statements contained favorable evidence. The State's failure to disclose the statements until the morning of the first day of trial, Lilly submits, prevented him from developing an alternative reconstruction of the accident to counter the State's head-on collision theory. According to Lilly, the police report "misled" his expert into believing that Lutte and Brown had seen the Lilly and Motter cars collide.

Lilly also contends that the statement of Stephen Brzozowski provided favorable evidence. According to Brzozowski, two vehicles approached the bridge from the same direction, not opposite directions. Lilly submits this statement would tend to contradict the State's theory of a head-on collision. Thus, Lilly claims that Brzozowski's statement should also have been disclosed earlier.

In addressing Lilly's alleged *Brady* violation, it must first be determined if the statements of the witnesses were, in fact, favorable. If so, this Court must then consider the question of materiality. If the information was both favorable and material, we must assess whether the delayed disclosure precluded Lilly's effective use of the information at trial.

The record reflects that the witnesses' trial testimony was consistent with their transcribed statements, rather than the police report. Brown and Lutte confirmed they had not observed the Lilly and Motter cars collide. Both women also testified, consistent with their recorded statements, that they had not seen Motter's car pass in front of them prior to the accident.

The Superior Court decided Lilly's *Brady* argument on several independent alternative grounds. The trial judge noted that although no witness saw the Lilly and Motter vehicles actually collide, and Brzozowski testified that a car followed Lilly's vehicle onto the bridge, that evidence did not "suggest in any way that this mysterious car, rather than [Lilly's] car, was in fact the one that struck [Motter's] car." The Superior Court also ruled that the witnesses' statements did not "have any bearing on the other facts of the case, including the fact that [Lilly] was travelling in excess of 100 miles per hour—more than 60 miles above the speed limit—when he struck [Motter's] car." The record supports the Superior Court's conclusion that the witnesses' statements did not provide favorable evidence on the issue of Lilly's guilt or innocence.

The determination that the witnesses' statements were not favorable, as that term is used in *Brady,* obviated the Superior Court's need to determine whether the evidence was material to Lilly's case. However, in ruling on Lilly's motion for a new trial, the Superior Court assumed, *arguendo,* that the statements did provide favorable evidence. It then concluded that the delayed disclosure did not result in a *Brady* violation.

"[R]egardless of the nature of the *Brady* violation, the test for determining the materiality of the nondisclosed matters is the same." *Michael v. State,* 529 A.2d at 756

(citing *United States v. Bagley,* 473 U.S. at 667, 105 S.Ct. at 3375). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383; *Michael v. State,* 529 A.2d at 756. The record reflects Lilly has failed to establish that, absent the delayed disclosure, the outcome of the trial would have been different.

The statements were available to Lilly's attorney when the witnesses testified at trial. The trial transcript indicates that, on cross-examination, the witnesses' testimony revealed the inconsistencies between the recorded statements and the police report. Thus, the trial included a presentation and consideration of the evidence at issue. Consequently, Lilly received the benefit of the recorded statements, and whatever doubt they cast on the State's case, through the witnesses' testimony at trial.

Lilly contends, nevertheless, that the delayed disclosure prevented effective use of the evidence at trial and that, with timely disclosure, proper use of that evidence may have provided an opportunity to change the outcome. According to Lilly, his accident reconstruction expert relied on the police report's recitation that Lutte and Brown witnessed the Motter and Lilly cars collide. Lilly posits that, had his expert known the two women did not see the cars collide, and had not seen Motter's car beforehand, the expert might have been able to reconstruct an accident scenario to challenge the State's head-on collision theory. After the verdict, Lilly made the same argument to the Superior Court in a motion for a new trial.

The Superior Court granted Lilly an additional month to file his motion for a new trial. The purpose of the extension was to enable Lilly to present the evidence contained in the witnesses' statements to the accident reconstruction expert and to demonstrate that the evidence was material to the outcome of the case. When the motion for a new trial was filed, however, it was not accompanied by an affidavit, or any other evidence, indicating that the expert's conclusion would have dif-

fered had the statements been disclosed earlier. Instead, Lilly's motion simply re-asserted the legal argument that the statements "would have potentially altered the Defendant's reconstruction report."

"When a defendant is confronted with delayed disclosure of *Brady* material, reversal will be granted only if the defendant was denied the opportunity to use the material effectively." *Rose v. State*, Del.Supr., 542 A.2d 1196, 1199 (1988) (citations omitted). No reversible error exists where the defense "has not demonstrated that the tardy disclosure prevented it from effectively presenting the evidence." *Dickens v. State*, Del.Supr., 437 A.2d 159, 162 (1981).[1] *See also Stokes v. State*, Del.Supr., 402 A.2d 376, 378–81 (1979). Not only did Lilly have the witnesses' statements for use at trial, but the Superior Court provided Lilly with an opportunity to use the statements effectively after the trial concluded.

The record reflects that even assuming the witnesses' statements were favorable *Brady* evidence, no violation was created by the State's delayed disclosure. First, Lilly was not precluded from effectively using the statements at trial. The evidence was available for Lilly's cross-examination of the witnesses. Second, the Superior Court extended the time for Lilly to file his motion for a new trial. Even so, Lilly was unable to demonstrate that the witnesses' statements were favorable. The record, therefore, supports the Superior Court's alternate holding that the "[d]efendant cannot show that the production of these statements at an earlier time would have enabled him to make better use of them."

### Evidentiary Rulings
### Discretion Exercised Properly

Lilly alleges the Superior Court abused its discretion in three rulings regarding the ad-mission of evidence during the course of his trial. The parties properly agree that "abuse of discretion" is the appropriate standard of appellate review for each of the three evidentiary rulings at issue. *See Tice v. State*, Del.Supr., 624 A.2d 399, 401 (1993). An abuse of discretion occurs when "a court has . . . exceeded the bounds of reason in view of the circumstances, [or] . . . so ignored recognized rules of law or practice so as to produce injustice." *Firestone Tire & Rubber Co. v. Adams*, Del.Supr., 541 A.2d 567, 570 (1988).[2]

■ The first alleged abuse of discretion occurred during the State's case-in-chief. The Superior Court permitted Sandra Carter to testify, over Lilly's objection, about the contents of a writing. Lilly asserts that the Superior Court erred in allowing her testimony rather than requiring the State to introduce the actual document.

Carter, a friend of Motter's, was allowed to testify regarding the contents of a tavern's sign-in book. The testimony was offered to establish Motter's presence in the tavern prior to the accident. Lilly contends that the "best evidence" of the contents of the sign-in book is the book itself.

The "best evidence rule" provides that "[t]o prove the contents of a writing, . . . the original writing . . . is required, except as otherwise provided in [the Rules of Evidence] or by statute." D.R.E. 1002. The Rules of Evidence provide several exceptions. First, the writing is not required if it is not related to a "controlling issue," i.e., if it only relates to "collateral matters." D.R.E. 1004(3). Second, the writing is not required if it was lost or destroyed or could not be obtained by available judicial process or procedure. D.R.E. 1004(1), (2).

---

1. In *Dickens*, even though the State conceded it probably had a duty to disclose the evidence at issue—a witness' statement—the Court found no *Brady* violation where the evidence was available to the defense at trial and was presented to the jury, there was an opportunity to cross-examine the witness, and the trial court offered a continuance if the defense needed time to "develop and evaluate the eyewitness' testimony." *Dickens v. State*, 437 A.2d at 162.

2. "[T]he trial judge is in a unique position to evaluate and balance the probative and prejudicial aspects of the evidence." *Smith v. State*, Del.Supr., 560 A.2d 1004, 1007 (1989); *see also Johnson v. State*, Del.Supr., 550 A.2d 903, 908 (1988); *Rush v. State*, Del.Supr., 491 A.2d 439, 445 (1985).

The Superior Court ruled the testimony regarding the sign-in book was admissible because Motter's location before the accident was only collateral to the issues of the case. The central issues in the case revolved around Lilly's conduct. Based upon the state of the record at the time Carter testified, it was not an abuse of discretion to find that Motter's location earlier in the evening was not related to a controlling issue.

■ The other two alleged abuses of discretion occurred during the presentation of Lilly's case. Both rulings precluded introduction of evidence regarding Motter's level of impairment from alcohol or cocaine. According to Lilly, each ruling was erroneous and prejudiced him by preventing the jury from fairly evaluating the role Motter's conduct may have played in her death.

Decisions of the trial judge to exclude irrelevant evidence, or evidence that is more prejudicial than probative, are clearly within the discretion accorded to trial judges on evidentiary matters. D.R.E. 401; D.R.E. 403; *Mercedes–Benz of N. Am., Inc. v. Norman Gershman's Things To Wear, Inc.*, Del. Supr., 596 A.2d 1358, 1366 (1991). Delaware Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." D.R.E. 401. "Evidence which is not relevant is not admissible." D.R.E. 402.

■ The definition of relevance encompasses materiality and probative value. *Getz v. State*, Del.Supr., 538 A.2d 726, 731 (1988) (citing C. McCormick, *Evidence*, § 185, at 541 (Cleary 3d ed. 1984)). Evidence is material if the fact it is offered to prove is "of consequence" to the action. *Id.* Evidence has probative value if it "advances the probability" that the fact is as the party offering the evidence asserts it to be. *Id.*

During the State's case, evidence was offered by accident reconstruction experts that Lilly collided head-on with the Motter vehicle while her vehicle was in its proper lane. During the trial, the defense did not seek to refute that conclusion. Lilly's own testimony established that he crossed the median and collided head-on with Motter. No evidence was offered to suggest that Motter had been driving in an improper place or manner.

Given the preceding undisputed evidence, Lilly failed to establish a factual basis demonstrating the relevance of Motter's conduct. While evidence of Motter's blood alcohol content or level of impairment from cocaine may have been probative of her conduct that night, such evidence is not relevant if it was not asserted at trial that Motter's conduct was a cause of the accident. Therefore, the record reflects the Superior Court properly exercised its discretion in declining to admit evidence suggesting Motter was impaired.

*Delaware Definition*
*Lesser–Included Offense*

Lilly argues that the Superior Court erred when it ruled that Vehicular Homicide in the First Degree (11 *Del.C.* § 630A(a)) was not a lesser-included offense to the charge of Murder in the Second Degree (11 *Del.C.* § 635(1)). Lilly's indictment alleged he "recklessly and under circumstances manifesti[n]g a cruel, wicked, and depraved indifference to human life cause[d] the death of Patricia A. Motter, by driving while under the influence of alcohol and at a high rate of speed and as a result he lost control of his automobile and collided headon [sic] with the automobile driven by Patricia A. Motter." According to Lilly, the offense of Vehicular Homicide was a lesser-included offense because the allegations in the indictment and the evidence presented at trial provided a rational basis for acquitting him of the charged offense and convicting him of Vehicular Homicide.

The Superior Court denied Lilly's request to instruct the jury concerning the crime of Vehicular Homicide. It held that, under Delaware law, an included offense is determined exclusively by a "statutory elements" analysis. Such an analysis does not examine the allegations in the indictment or the evidence presented, but focuses solely upon the "elements" in the statutory definitions of the charged offense and the alleged lesser-included offense.

In Delaware, lesser-included offenses are defined by statute:

(b) A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:

(1) It is established by the proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(3) It involves the same result but differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability suffices to establish its commission.

11 *Del.C.* § 206.

The official commentary to the Delaware Criminal Code states that Subsection [b][1] provides the "standard" statutory elements definition of included offenses. *Delaware Criminal Code with Commentary,* 15 (1973) (*"Code Commentary"*). This Court has recognized the propriety of using the "statutory elements" test to determine lesser-included offenses. *See Ward v. State,* Del.Supr., 575 A.2d 1156, 1158–59 (1990). This Court's holding in *Ward,* however, can most accurately be characterized as deciding that *one* proper focus under 11 *Del.C.* § 206(b) is on the statutory elements of the offenses, i.e., Section 206(b)(1).

■ Unlike its federal corollary, the Delaware statute prescribing included offenses is not limited exclusively to the standard "statutory elements" definition. *See* 11 *Del.C.* § 206; *Cf. Schmuck v. United States,* 489 U.S. 705, 715–21, 109 S.Ct. 1443, 1450–53, 103 L.Ed.2d 734 (1989) (Fed.R.Crim.P. 31(c) adopts "statutory elements" approach).[3] In fact, the official commentary to the Delaware Criminal Code states that subsection 3 of the Delaware definition of included offenses expressly contemplates that "there may be

some dissimilarity in the elements necessary to prove the [included] offense." *Code Commentary* at 16. With regard to subsection 3, the *Code Commentary* provides:

[Subsection 3] differs from [Subsection 1] in that, although the included offense must produce the same result as the inclusive offense, *there may be some dissimilarity in the elements necessary to prove the offense.* Therefore, [1] would not strictly apply and [3] is needed to fill the gap. For example, *criminally negligent homicide* would probably not be included in murder under [1], because negligence is different in quality from intention. It would obviously be included under [3], because the result is the same and only the required degree of culpability changes. (emphasis added).

*Code Commentary* at 16. The same rationale that concludes, under appropriate factual circumstances, that Criminally Negligent Homicide is an included offense of Murder would also determine Vehicular Homicide to be an included offense of Murder in the Second Degree.

In this appeal, the State candidly acknowledged the propriety of instructing the jury on an included offense often depends on "particular fact situations." *See Code Commentary,* Appendix B, at 501. In *Ward,* this Court held that even under a "statutory elements" approach, the trial court is not obligated to charge the jury with an included offense unless there is a rational basis for such an instruction in the evidence. *Ward v. State,* 575 A.2d at 1159. Conversely, under appropriate factual circumstances, Delaware's expanded definition of included offenses in Section 206(b)(2) and (3) obligates the trial court to instruct the jury on an offense that has rational evidentiary support in the record, notwithstanding a "dissimilarity in the elements necessary to prove [that] offense" and the charged offense. *Code Commentary* at 16.

■ In Lilly's case, the jury was instructed about the charged offense of Murder in

---

3. *See* Christen R. Blair, *Constitutional Limitations on the Lesser Included Offense Doctrine,* 21 Am.Crim.L.Rev. 445, 447–49 (1984) (reviewing various tests for defining lesser included offenses).

the Second Degree. That instruction required the jury to find Lilly acted with "reckless" culpability and "depraved indifference" towards the risk of causing death. The jurors were next instructed on the crime of Manslaughter. 11 *Del.C.* § 632(1). Finally, the jury was instructed on the offense of Criminally Negligent Homicide. 11 *Del.C.* § 631. Unlike the charged offense of Murder in the Second Degree, the crime of Criminally Negligent Homicide required the jury to find Lilly acted with negligent culpability, unaware of the risk of death he was creating.

The record reflects that, under the facts of Lilly's case, the Superior Court properly decided to instruct the jurors regarding Criminally Negligent Homicide, notwithstanding its erroneous conclusion that in Delaware included offenses are determined exclusively by a "statutory elements" analysis. Those same facts, however, provided rational evidentiary support for and obligated the Superior Court to instruct the jury regarding the crime of Vehicular Homicide. *See* 11 *Del.C.* § 206(b)(3) and (c). *Accord Ex Parte Jordan,* Ala.Supr., 486 So.2d 485, 486–89 (1986). Consequently, this Court must now consider the nature of that error.

■ The failure to properly instruct the jury regarding a lesser offense is not reversible error *per se. Ross v. State,* Del.Supr., 482 A.2d 727, 736 (1984), *cert. denied,* 469 U.S. 1194, 105 S.Ct. 973, 83 L.Ed.2d 976 (1985). This Court and other courts have found such an error harmless when the jury was presented with, but rejected, lesser offenses than the one for which the defendant was convicted. *Id.; Schad v. Arizona,* 501 U.S. 624, 646–47, 111 S.Ct. 2491, 2504–05, 115 L.Ed.2d 555 (1991); *Geschwendt v. Ryan,* 967 F.2d 877, 882–87 (3rd Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 472, 121 L.Ed.2d 379 (1992). In *Geschwendt,* the Third Circuit held:

> *Schad,* of course, did not announce a new principle of law, for it was and is consistent with the great weight of state authority. *See State v. Mendez,* 252 N.J.Super. 155, 165–55, 599 A.2d 565, 570–71 (App.Div.1991) (collecting cases). *Schad* teaches us that, in cases involving offenses on a ladder, if the trial court

wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict for an offense higher up rather than for an intermediate offense which was also charged.

There is simply no escape here from the principle underlying *Schad.* In *Schad,* the trial court refused to give an instruction, supported by the evidence, that would have permitted the jury to return a verdict for a lesser included offense. But the Supreme Court held that the first degree murder verdict was reliable because the jury had not returned a verdict for the intermediate offense of second degree murder.

*Geschwendt v. Ryan,* 967 F.2d at 884.

Furthermore, some courts have noted that the failure to instruct the jury on a lesser-included offense supported by the record is *clearly* harmless when the jury was presented with and rejected the opportunity to convict the defendant of a lesser offense that was consistent with the defendant's theory of the case. *Ex Parte Jordan,* 486 So.2d 485. *See also People v. Beach,* 429 Mich. 450, 418 N.W.2d 861, 879 (1988). Such a situation is reflected in the record of Lilly's case. In his closing remarks to the jury, Lilly's attorney argued:

> And I am not coming in here asking you to find him not guilty of anything. I told you that the first day I got here. I said he did something wrong. He made a mistake and you are going to now tell us what it was. But we're talking about a pretty significant offense in criminally negligent homicide.... Reckless is defined as he is aware of and consciously disregards a substantial and unjustifiable risk of death, and criminally negligent is that he failed to perceive the risk of death, but the risk was so great that a reasonable person should have been able to perceive it.... [Lilly] couldn't have consciously disregarded a substantial risk of the death of Patricia Motter. He couldn't even see she was there. He fits into a category of a reasonable person that should have assumed that there could have been a risk, and that makes him criminally negligent....

If the jury was persuaded by the foregoing argument that Lilly acted negligently and did not perceive the risk of death he created, it had the opportunity to convict him of the included offense of Criminally Negligent Homicide.

The jury's verdict reflects its factual determination that Lilly perceived the risk of death and acted with a reckless, depraved indifference to that risk. The jury's decision to convict Lilly, as charged, of Murder in the Second Degree and to reject the option of finding Lilly guilty of Criminally Negligent Homicide leads this Court to conclude that the Superior Court's erroneous decision not to instruct the jury regarding Vehicular Homicide was harmless beyond a reasonable doubt. *Ross v. State,* 482 A.2d at 736; *Schad v. Arizona,* 501 U.S. at 646–47, 111 S.Ct. at 2504–05. *Accord Ex parte Jordan,* 486 So.2d at 486–89. *See also People v. Beach,* 418 N.W.2d at 879.

### *Conclusion*

The judgments of the Superior Court are AFFIRMED.