Regina LAGOLA, Defendant–
Below, Appellant,

v.

Walter F. THOMAS, Plaintiff–
Below, Appellee.

No. 566,2003.

Supreme Court of Delaware.

Submitted: Oct. 6, 2004.
Decided: Jan. 31, 2005.

Kenneth M. Doss, of Casarino, Christman & Shalk, Wilmington, DE, for Appellant.

Michael D. Bednash, of Kimmel, Carter, Roman & Peltz, Bear, DE, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, RIDGELY, Justices, constituting the court en banc.

RIDGELY, Justice, for the majority:

Appellant, Regina Lagola, seeks reversal of a judgment of the Superior Court awarding damages of one million dollars in a personal injury case arising from an automobile accident. The Superior Court concluded that Lagola was not entitled to a new trial. In this appeal we expressly overrule *Laws v. Webb*[1] to the extent it permitted testimony from a police officer about the "primary contributing circumstances" of an accident. Absent qualification of the witness as an expert in accident reconstruction, opinion testimony on the "primary contributing circumstance" of an accident is inadmissible under Delaware Rule of Evidence 701. Because the admission of this opinion testimony jeopardized the fairness of the trial in this case, we reverse and remand this matter for a new trial.

---

1. 658 A.2d 1000 (Del.1995).

## I. *Factual Background*

On February 7, 1999, an automobile accident occurred on Appleby Road in New Castle, Delaware. Thomas and Lagola were the parties involved in this two car accident. Thomas, traveling west on Appleby Road in his 1986 Ford F–150 pick-up truck, came to a complete stop behind a van that was stopped to make a left-hand turn. As he was waiting for the van to turn, Thomas' truck was struck in the rear by a 1992 Pontiac Grand Prix driven by Lagola. Thomas testified that he could see Lagola's car coming at him in his rear view mirror and was able to observe the front end of Lagola's car dip with its headlights going toward the ground. The accident caused Thomas' pick-up truck to move forward, but without striking any other vehicle. Both vehicles suffered damage as a result of the accident.

At the time of the accident, it was sleeting and raining. However, Thomas testified that the road was wet but not icy. Patrolman Charles H. Shepard of the New Castle County Police Department, the investigating officer, also testified that the road was wet but not icy. Lagola, on the other hand, testified that the road was icy. Lagola's sister, Christine Burgess, a passenger in Lagola's vehicle, testified that it had been raining and sleeting since that morning and that she remembered slipping as she was walking toward Lagola's car earlier that day.

Thomas was taken by ambulance from the scene of the accident to Christiana Hospital. He had complaints of neck pain and left hand numbness. After his discharge from the hospital, Thomas sought and received treatment from numerous physicians. Thomas' family physician, Gregory Papa, M.D., referred Thomas to a chiropractor, with whom he began receiving treatment three times a week. Thomas' chiropractic treatment lasted several months. Thomas also sought treatment from John E. Hocutt, Jr., M.D., a family and sports medicine physician. However, after Thomas' neck and left arm problems continued to worsen, Doctor Papa referred Thomas to a neurosurgeon, Matthew J. Eppley, Jr., M.D. On August 23, 1999, Doctor Eppley performed cervical surgery on Thomas. Following surgery, Thomas completed physical therapy and was treated by various doctors. Thomas also received trigger point injections underneath his left shoulder blade, but these injections did not improve his condition. At the time of trial, the only doctor treating Thomas was Doctor Papa, whom Thomas saw monthly for medication.

Before and after the accident, Thomas was employed as a tractor-trailer driver hauling steel on flat bed trailers. This position required him to tie down the steel, a job that he has been performing for over eighteen years before the accident. Immediately following the accident, Thomas was out of work for over a month. He returned to work until the date of his surgery on August 23, 1999, after which he was out of work until December 1999. When Thomas returned to work after surgery, he experienced daily neck pain and required the assistance of others to tie down the steel loads. As a result of his daily neck pain, Thomas, in December 2001, gave two weeks notice and ceased his employment as a tractor trailer driver.

The case proceeded to a four day trial by jury. The first witness called by Thomas' counsel was Patrolman Shepard. He testified on the issue of the "primary contributing circumstance" to the accident, over the objection of defense counsel, as follows:

Q. All right. Now, on your report, did you indicate what the primary contributing circumstance to the accident was?

A. Yes, I did.

Q. And what did you indicate there?

A. In Block 8, which is speed too fast.

Q. Speed too fast?

A. Speed too fast, yes.

Thomas' counsel next called Jack Fink, an actuarial expert, who testified to Thomas' future lost wages. Thomas then testified on his own behalf. On the second day of trial, Joel Castro, a vocational expert, testified for Thomas regarding Thomas' pre and post-injury earning capacity. Thomas then presented the video depositions of Doctors Eppley and Hocutt. During the course of the plaintiff's case, only counsel questioned the witnesses.

Lagola put on her defense starting on the third day of trial, and was the first witness to testify on her own behalf. During Lagola's testimony, the trial judge began questioning Lagola in front of the jury. He questioned Lagola about the timing of when she observed Thomas' pickup truck, her distance at that point and when she started breaking.

Lagola then called Kirk L. Thibault, Ph. D., to testify as her biomechanical expert on the forces involved in the accident and the forces exerted upon Thomas during the accident. At the end of Dr. Thibault's testimony, the trial judge questioned that expert witness in the presence of the jury. Dr. Thibault's testimony ended with the trial judge questioning whether the speed of Lagola's vehicle could be determined given the available evidence. After Dr. Thibault acknowledged that speed was not part of his analysis, the trial judge questioned him about the speed of the vehicle. The testimony of Burgess then followed, and the day concluded with the video testimony of Thomas' biomechanical expert, Steven C. Batterman, Ph.D.

On the last day of trial, Lagola's case concluded with the live testimony of Mi-chael L. Brooks, M.D., a neuroradiologist. Doctor Brooks testified that after reviewing films of Thomas (including x-rays, CT scans and an MRI), he found multiple degenerative changes to the cervical spine, all of which predated the accident. Doctor Brooks opined that none of Thomas' conditions related to this accident. At this point, the trial judge interrupted and asked Dr. Brooks whether a traumatic event such as the accident occurring on February 7, 1999 might have exacerbated Thomas' preexisting condition. After the trial judge completed his questioning of Doctor Brooks, Lagola concluded her case with the video testimony of Richard A. Fischer, M.D.

Thomas moved for a directed verdict, but this motion was denied. Thereafter, Lagola's counsel expressed concern with the trial judge's questioning of the defense witnesses and the appearance it presented to the jury. The trial judge responded:

Well, I have an obligation to—to make sure that issues I feel are confusing is presented to the jury in the best light, as they can help make a decision. I don't intentionally interfere with counsel's presentation of the case. I'm not an activist in that regard. I seldom ask questions, unless either the language that was being used was confusing to me. And perhaps I thought it would be confusing to the jury, or it was an issue I was concerned that the impression that was being left was perhaps not balanced. And so I've asked a few questions. If the Supreme Court thinks I've asked them improperly, they will tell me that.

The parties' closing arguments followed. During Thomas' closing argument, his counsel referred to Patrolman Shepard's testimony that the speed of Lagola's vehicle was the "primary contributing circum-

stance" of the accident. Specifically, Thomas' counsel argued:

"So, number one, we think all the evidence shows it wasn't icy. It wasn't icy. The defense is entirely predicated upon the road being icy. If you assume the road was icy, she drove her car too fast for the road conditions. And we feel that's why you should answer yes to No. 1."

Question No. 1 to the jury was "Do you find that defendant, Regina Lagola, was negligent in a manner which proximately caused the accident of February 7th, 1999." Thomas' counsel also reviewed the opinions of the parties' biomechanical experts and requested that the jury use their "common sense" in reviewing Lagola's biomechanical expert's testimony.

The jury returned a verdict in Thomas' favor. Question No. 1 was answered "yes" as Thomas' counsel had urged. When the jury foreman was asked: "What do you find to be fair and reasonable compensation to Walter Thomas for injuries sustained as a proximate result of the accident on February 7, 1999?", the foreman replied "Five dollars -- one million dollars." Lagola claims that the jury laughed and that the foreman was smiling when the verdict was returned. The record shows that the trial judge noted that the verdict sheet indicated one million dollars and that when the jury was questioned, it agreed with this figure for damages.

## II. *Discussion*

Lagola raises several issues on appeal. We discuss two of these issues, and conclude that Lagola is entitled to a new trial. The first issue is the admissibility of the police officer's testimony concerning the "primary contributing circumstance" of the

automobile accident. This issue turns on whether that testimony is admissible factual testimony or an inadmissible lay opinion. We conclude that absent Patrolman Shepard being qualified as an expert in accident reconstruction, his testimony on the "primary contributing circumstance" of the accident was inadmissible under Delaware Rule of Evidence 701. It is undisputed that the officer was not an accident reconstruction expert qualified to testify on matters of causation. We conclude that it was error to admit such testimony and that a new trial is warranted.

The second issue we address presents the question of whether the trial judge abused his discretion in his manner of questioning defense witnesses in front of the jury. While we need not decide whether the trial judge's questions warrant reversal because we have decided already that a new trial is warranted, we emphasize that a trial judge must exercise extreme caution and self-restraint in the questioning of witnesses before a jury because of the potential influence such questioning may have upon the jury. Caution and self-restraint should be exercised by the trial judge at the new trial.

### A. *Patrolman Shepard's testimony concerning the "primary contributing circumstance" of the accident*

We turn first to the issue of the admissibility of Patrolman Shepard's testimony regarding the "primary contributing circumstance" of the accident. We review a trial judge's evidentiary ruling for abuse of discretion.[2] Reversible error in the admission of evidence occurs only if there is an "error in the ruling" and "a substantial right of the party is affected."[3]

---

**2.** *Lilly v. State,* 649 A.2d 1055, 1059 (Del. 1994).

**3.** *Mercedes–Benz of N. Am., Inc. v. Norman Gershman's Things to Wear, Inc.,* 596 A.2d

Delaware Rule of Evidence 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.[4]

"A lay witness may only express an opinion when the perception of the witness cannot be communicated accurately and fully without expressing it in terms of an opinion ..."[5]

Patrolman Shepard's testimony that the "primary contributing circumstance" of the accident was that Lagola was driving "too fast" was not testimony based upon facts he perceived but, rather, was a conclusion based on his opinion as a layman. Here, the required foundation to admit such a lay opinion was not established. Because Patrolman Shepard did not testify to the facts he perceived as a result of his investigation of the accident, his lay opinion testimony was inadmissible under Delaware Rule of Evidence 701. Our holding in this case is consistent with *Alexander v. Cahill*,[6] in which we held that a state trooper's testimony attributing the *cause* of an automobile accident to the defendant motorists was an inadmissible lay opinion.[7] Lagola argues that "primary contributing circumstance" and

"proximate cause" are entirely different concepts. She points to the definitional differences between the terms *cause* and *circumstance*. "Cause" is defined as "something that produces an effect or result,"[8] whereas "circumstance" is defined as "an accompanying or accessory fact, event, or condition, such as a piece of evidence that indicates the probability of an event."[9] Lagola maintains that this difference in definitions distinguishes this case from *Alexander*. She argues that this case is much more similar to *Laws v. Webb*.[10] In *Laws*, we concluded that a trial judge did not abuse his discretion where the officer "did not testify that [the defendant motorist's] improper crossing was the legal or proximate 'cause' of the accident for purposes of [the] negligence action, but rather, the officer testified that at the time of the accident, he merely filled in the 'primary cause' box on his report with the phrase 'improper crossing.'"[11]

We do not find Lagola's argument persuasive, nor do we believe that a reasonable juror would appreciate the distinction that Lagola strives to make. We conclude that there is little to distinguish between the terms "primary cause" and "primary contributing circumstance." Both pertain to what primarily brought about the accident. And both involve matters of opinion. We therefore expressly overrule *Laws v. Webb* to the extent it is inconsistent with our holding in *Alexander v. Cahill*.

Applying the teachings of *Alexander*, it is undisputed here that Patrolman

---

1358, 1365 (Del.1991) (quoting Delaware Rule of Evidence 103(a)).

4. Delaware Rule of Evidence 701.

5. *Seward v. State*, 723 A.2d 365, 372 (Del. 1999).

6. 829 A.2d 117 (Del.2003).

7. *Id.* at 121–22 (emphasis added).

8. Black's Law Dictionary 212 (17th ed. 1999).

9. Black's Law Dictionary 236 (17th ed. 1999).

10. 658 A.2d 1000 (Del.1995).

11. *Id.* at 1010.

Shepard was not qualified in accident reconstruction. His testimony that Lagola's speed was the "primary contributing circumstance" of the accident went to the heart of the case in which the testimony of the parties was in conflict. Given the conflicting testimony on road conditions, we find that the admission of this opinion testimony of the investigating police officer jeopardized Lagola's substantial right to a fair trial. We therefore conclude that Lagola is entitled to a new trial.

### B. *The trial judge's questioning of three defense witnesses*

The trial judge's questioning of defense witnesses in this case started with the defendant and continued throughout the defendant's case. While Lagola was not an expert witness, she was a key witness who was a party to the accident and the litigation. The trial judge's questions concerned the timing of when Lagola observed Thomas' pick-up truck, her distance at that point from Thomas' pick-up truck, and when she started braking. Lagola argues that the trial judge's questions focused on crucial areas of her testimony about defenses of unavoidable accident and sudden emergency, and that those precise areas had already been the subject of direct and cross-examination. Lagola contends that while the questions were not abusive *per se*, they nonetheless, in context, created doubt as to her earlier testimony on distance, visibility and reaction.

Dr. Thibault, who testified next for the defense, was also subjected to the trial judge's examination. The trial judge questioned Dr. Thibault about whether the speed of Lagola's vehicle could have been determined given the available evidence.

After Dr. Thibault acknowledged that speed was not part of his analysis, the trial judge continued to ask about an "outside estimate" of Lagola's speed.

The trial judge also questioned Doctor Brooks, Lagola's medical expert. At trial, Thomas was claiming a neck injury with nerve impingement resulting in pain flowing from his neck down his left arm. Doctor Brooks was called as an expert to dispute the claim that Thomas' pain resulted from the accident. Doctor Brooks testified that Thomas' pain, surgery and discontinuance from work resulted from degenerative conditions to his spine which existed prior to the accident. Doctor Brooks formed his opinion after reviewing Thomas' x-rays, CT scans and an MRI. The trial judge's questions of this witness focused on whether a traumatic event might have exacerbated Thomas' preexisting conditions. Lagola contends that the judge's repeated questions of her defense witnesses called their credibility into issue.

■ Initially, we note that Lagola's counsel did not express any concern about the trial judge's questioning of three defense witnesses until after Thomas' motion for a directed verdict was denied. Absent plain error, we will not review claims that are not fairly presented to the trial court.[12] Our review "entails not only the substance of the ruling on admissibility, but the manner in which it was formulated."[13]

■ The trial judge "should act as a gatekeeper to all expert testimony and must decide if the expert's testimony 'has a reliable basis in knowledge and experience of [the relevant] discipline.'"[14] This role of the trial judge "as gatekeeper also carries with it a heightened requirement of

**12.** DEL. SUP. CT. R. 8.

**13.** *Price v. Blood Bank of Delaware, Inc.*, 790 A.2d 1203, 1210 (Del.2002).

**14.** *Id.* (citing *M.G. Bancorporation v. Le Beau*, 737 A.2d 513, 523 (Del.1999)).

impartiality whenever the trial judge engages in direct questioning of an expert witness[,]" particularly when it is done in the presence of the jury "who may later be called upon to evaluate the credibility of the witness." [15] The trial judge's role as a gatekeeper should be performed outside the presence of the jury either through motions *in limine* prior to trial or during preliminary voir dire by counsel of a proposed expert.[16]

■■■■ A trial court is permitted to interrogate witnesses "whether called by itself or a party." [17] However, a trial judge is required to exercise self-restraint and preserve an atmosphere of impartiality when questioning witnesses.[18] This requirement "arises from the judge's absolute duty of neutrality." [19] "Departure from that rule may be grounds for reversal on the basis of plain error." [20] Although a trial judge may instruct the jury that he or she is impartial, the judge's conduct may suggest the contrary because the trial judge is a figure having overpowering influence upon the jury.[21] For example, in *Price*, although the trial judge instructed the jury that he was impartial, this Court held that the trial judge's questioning of an expert witness constituted plain error, warranting a new trial because the trial judge's questions carried a tone of skepticism and the judge had peremptorily rejected the expert's initial opinion on the ground that it lacked a scientific foundation.[22] Here, the trial judge's questioning of none of plaintiff's witnesses but of al-

most all of the defense witnesses who appeared in person at trial, was fraught with potential adverse implications for the jury to draw, despite the trial judge's subjective intention to help the jury. Furthermore, questions designed by the trial judge here to balance an impression being left with the jury were more appropriate for counsel to ask.

■■■■ Because we have concluded that a new trial is required on other grounds, we need not decide whether the trial judge's questioning in this case itself constitutes plain error. We do note our concern over the appearance of the questioning in this case, however, and take this opportunity to emphasize the caution required when questioning witnesses because of "'the recognized extraordinary prestige of the trial judge.'" [23] It is the trial judge's duty to maintain an impartial attitude and a status of neutrality and to keep his or her questions and comments in front of the jury to a minimum,[24] including the questioning of witnesses pursuant to Delaware Rule of Evidence 614(b). Self-restraint in the questioning of any witness should be exercised by the trial judge at the new trial.

### III. *Conclusion*

We expressly overrule *Laws v. Webb* to the extent that it is inconsistent with our holding in *Alexander v. Cahill*. We conclude that a lay opinion by a police officer who is not qualified as an expert in acci-

---

15. *Id.*

16. *Id.* at 1212.

17. Delaware Rule of Evidence 614(b).

18. *Price,* 790 A.2d at 1210.

19. *Id.*

20. *Id.*

21. *Id.* (citing *Travelers Ins. Co. v. Ryan,* 416 F.2d 362, 364 (5th Cir.1969)).

22. *Id.* at 1211–12.

23. *Id.* at 1211 (citing *Block v. Target Stores, Inc.,* 458 N.W.2d 705, 713 (Minn.Ct.App. 1990)).

24. 75 Am. Jur. 2D *Trial* § 276 (2004).

dent reconstruction about the "primary contributing circumstance" of an accident contravenes Delaware Rule of Evidence 701 and is, therefore, inadmissible. Because the officer's opinion testimony related to causation which was a critical issue in this case where the testimony was in conflict, the admission of that opinion testimony jeopardized the fairness of the trial.

Accordingly, the judgment of the Superior Court is **REVERSED** and the case is **REMANDED** for a new trial consistent with this opinion.

BERGER, Justice, Concurring with whom STEELE, Chief Justice, Concurs.

Although I agree with the majority's decision to reverse, I write separately to address the trial judge's questioning of Lagola and her witnesses. The majority expressed concern, and cautioned the trial judge to exercise self-restraint, but did not decide whether his questions amounted to plain error. I think it is important to decide this issue because, although trial judges undoubtedly understand the operative principles of self-restraint and impartiality, the general admonitions in Price v. Blood Bank of Delaware, Inc.[25] provide more guidance when applied to specific fact patterns.

This was a relatively uncomplicated personal injury claim arising from a car accident. Two significant issues in dispute were: i) the speed of Lagola's car prior to impact; and ii) whether Thomas's pain was caused by the accident or by pre-existing degenerative changes in his spine. During the first two days of trial, Thomas presented his case. His witnesses, in addition to himself, were: i) the police officer who responded to the accident, ii) an economist, who testified as to Thomas's lost earnings; iii) two doctors; and iv) a vocational ex-

pert. The trial judge asked no questions of any of Thomas's witnesses.

On the third day of trial, Lagola was the first witness for the defense. She was examined, cross-examined, and examined again on redirect. The three basic points covered by both sides were the road conditions at the time of the accident; her speed at the time she saw Thomas's car stopped in the road ahead of her; and her distance from Thomas at the time she hit the brakes. After counsel concluded their questioning, the trial judge, who explained that he was trying to visualize the road and the accident, questioned Lagola on the same subjects. Thomas's attorney then followed up with another round of questions about speed and distances.

Lagola's second witness was Dr. Kirk Thibault, a biomechanical expert, who testified about the force of the crash, and opined that the level of force was insufficient to "provide the mechanism" for acute disc herniation. After fairly extensive cross-examination, the trial judge again asked the witness his own questions. This time, the trial judge explained that he was going to cover a point that had not been addressed during the parties' questioning. The trial judge then elicited Thibault's admission that: i) it would have been possible to calculate Lagola's speed at impact using her testimony as to the speed she was traveling when she hit the brakes, her distance from Thomas's car at that moment, and an appropriate coefficient of friction for an icy road; ii) Thibault did not perform such a calculation, but instead estimated the collision speed at 15 mph based on the extent of damage to the vehicles; and iii) if the collision speed was greater than 15 mph, the force level would be higher and the resultant damage would be greater.

25. 790 A.2d 1203 (Del.2002).

The trial judge did not ask questions of Lagola's next witness, who was Lagola's sister and the passenger in Lagola's car at the time of the accident. On the following morning, however, when Lagola called her last witness, the trial judge again participated in the examination. Dr. Michael Brooks, a neuroradiologist, explained how Thomas's x-rays revealed certain degenerative changes in Thomas's spinal cord. Brooks opined that those changes could not have been caused by the accident because the bone formations he observed take a long time to develop. As Lagola's counsel was asking Brooks about an opposing expert's opinion, the trial judge interrupted counsel in mid-question to pursue his own line of inquiry.

The judge asked, in essence, whether a sudden impact could cause small changes in the bone or nerve alignment that would cause what had been asymptomatic degenerative changes to become symptomatic. After Brooks responded that there was nothing on the x-rays to indicate any new injuries, the judge asked whether there is some way of explaining what has happened when a patient develops pain after a traumatic event, but the x-rays do not show anything. Brooks responded that pain is subjective and that his analysis was concerned with objective findings from the x-rays. Lagola's counsel then resumed questioning his witness, and, after cross-examination and re-direct, the trial judge asked a few more questions. Through his final question, the judge pointed out that radiologists assist the surgeons, who make the decision on appropriate treatment and perform the operations.

It is apparent from the transcript that the trial judge did not question any witness for prolonged periods, and that his demeanor was not at all hostile. Nonetheless, I would hold that the trial court's questioning crossed the line and constituted plain error. Several factors support this conclusion. First, the trial judge questioned only Lagola's witnesses, and he questioned all but one of them. This fact, alone, strongly suggests to the jury that the trial judge had reservations about Lagola's case. Second, the trial judge interrupted counsel to question one of Lagola's experts. Third, the trial judge's effective cross-examination of Lagola's experts cast doubt on their conclusions. In sum, the trial judge stepped out of his proper, neutral, position of authority, and assumed the role of advocate.

It can be difficult for a judge to exercise self-restraint, especially if the judge perceives any relevant areas of inquiry that the parties failed to address. But the "search for truth" must be conducted by the parties, not the court. Thus, as a general rule, the trial judge should not question witnesses in front of the jury except for the purpose of clarifying an undisputed fact that a witness misstates, such as the date of the accident. If an expert's testimony is difficult to follow, questioning by the trial judge, even if only designed to clarify the expert's opinion, is problematic. Here, the trial judge undoubtedly believed that he was helping to present the facts fairly. From the jury's perspective, however, the judge's questions cast doubt on Lagola's case. Accordingly, I would reverse on this ground.