**Adam WATKINS, Defendant Below–Appellant,**

v.

**STATE of Delaware, Plaintiff Below–Appellee.**

No. 239, 2010.

Supreme Court of Delaware.

Submitted: May 18, 2011.
Decided: June 28, 2011.

Bernard J. O'Donnell, Esquire, of the Office of the Public Defender, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., Esquire, of the Department of Justice, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, and RIDGELY, Justices.

RIDGELY, Justice:

Barbara Santana was robbed at gunpoint as she attempted to withdraw cash from an automatic teller machine. Video surveillance at the bank captured the events. Police used that surveillance footage to create an "attempt to identify" flyer, which included the operative facts of the crime and two photographs of the perpetrator in the act. After two law enforcement officers identified Defendant–Below/Appellant, Adam Watkins, as the perpetrator in the flyer, Watkins was charged by indictment with robbery first degree and possession of a firearm during the commission of a felony ("PFDCF"). At a jury trial that followed, defense counsel proffered evidence of a different bank robbery that recently had occurred across the street from the bank where Santana was robbed. Defense counsel called the man who had pled guilty to that crime as a witness at Watkins' trial in an attempt to create a reasonable doubt that Watkins had robbed Santana. But, the trial judge concluded that the evidence of the nearby robbery was "too attenuated" and excluded defense counsel's proffer. The jury ultimately found Watkins guilty of robbery first degree and PFDCF. On appeal, Watkins argues that the trial judge abused his discretion by precluding Watkins' proffer of exculpatory evidence to establish a reasonable doubt that someone else may have committed the crime charged. After carefully reviewing the proffered evidence, we reverse Watkins' convictions and remand the matter for a new trial consistent with this Opinion.

### PNC Robbery

One Friday night approximately two years ago, Barbara Santana visited a PNC Bank not far from where she lived. As Santana walked towards the automatic teller machine ("ATM"), she observed a man who was holding a gun and approaching her. Santana recalled that the man was wearing a cap, sunglasses, a dark shirt, and jeans. The man grabbed Santana and instructed her to withdraw five hundred dollars from the ATM. Santana complied, and when the ATM dispensed the cash, the man took the cash and fled into a nearby neighborhood.

### Investigation

The following Monday, Detective Corey Godek of the Delaware State Police was directed to investigate the PNC Robbery. Two days later, a PNC Bank manager sent Godek an email, which included three still photographs of the perpetrator in the act. Godek used two of those photographs to create an "attempt to identify" flyer (the "Flyer"), which also included the relevant facts of the crime. Godek circulated the Flyer through Delaware's law enforcement information sharing system. Godek also

caused the Flyer to be posted to an internet version of a local newspaper. Two law enforcement officers identified the defendant, Watkins, as the man in the Flyer's photographs. Less than one week after Santana was robbed, police arrested Watkins for the crime. Police then executed a search warrant at Watkins' apartment, which was located approximately two miles from the PNC Bank. Police recovered two black caps and several pairs of sunglasses, but those items were not otherwise connected to the PNC Robbery. Police did not recover a gun or ammunition.

### Procedural History

Thereafter, Watkins was charged by indictment with robbery first degree and PFDCF. The matter proceeded to a jury trial. Defense counsel employed a single strategy: misidentification. In defense counsel's opening statement, he explained:

> And I'm going to tell each and every one of you without any doubt, when [the prosecutor] stands up and says the State rests, you're going to look over there and say, you know what? He probably did it, because it does look like him. Your job as jurors is to restrain from, okay, game's over, halftime, and say, let's wait to see what happens in the second half. And I guarantee you, I guarantee you, there's going to be something that happens in the second half that you go, whoa, look at that. Internally, a head-snapper, and the moment that you have that head-snapper, you're going to have in your head there's a reasonable doubt here. Was it really him? Mark me on it. He gets a call at the end of the endeavor and say, remember when [defense counsel] told you about the head-snapper, well, I said it. See if I can deliver.

The prosecutor then presented the State's case. Detective Godek testified about his investigation and the creation of the Flyer. Santana testified about the PNC Robbery itself. The prosecutor then called the two law enforcement officers that had identified Watkins as the man in the Flyer's photographs. Daniel Daly, an investigator for the Attorney General's Office, testified that he had known Watkins since he was approximately ten or eleven years old. Daly described Watkins as "a family friend." But, Daly testified that he only saw Watkins "maybe once a year or so in the last few years." Nevertheless, Daly testified that when he observed the Flyer, he "immediately" said, "I know who that is." Daly attributed his certainty to Watkins' profile: "It's the profile. That's Adam's profile."

Detective Nicholas Terranova of the Delaware State Police also testified. Terranova explained that he attended the same elementary school as Watkins and that he "continually saw different members of the family from then on throughout [his] ... adulthood." On direct examination, Terranova testified: "I'm 100–perecent sure that's Adam Watkins. When you look at the picture, it looks like a Watkins.... [W]hen I saw the picture ..., just the jaw line, then I knew that was Adam Watkins."

The next day, defense counsel attempted to call his first witness, Joseph Blevins. Blevins recently had pled guilty to a robbery at Artisans' Bank (the "Artisans' Robbery"), which is located across the street from the PNC Bank where Santana was robbed. Blevins committed the Artisans' Robbery six weeks before the PNC Robbery occurred. Like the perpetrator in the PNC Robbery, Blevins fled into the nearby neighborhood. But, unlike the perpetrator in the PNC Robbery, Blevins used a threatening note (not a gun) and robbed the bank itself (not a customer). Also, Blevins committed the Artisans' Rob-

bery during the day, whereas the PNC Robbery occurred at night.

The trial judge first asked a threshold question:

> The Court: ... If Blevins testifies, is he going to take the Fifth Amendment on this, or is he going to admit it, or is he going to deny being involved in the crime here?
>
> Defense Counsel: I would expect him not to admit that he's involved in the crime here.

Blevins was then brought into the courtroom, and the trial judge observed him. The trial judge and Blevins engaged in the following exchange:

> The Court: ... [D]o you have any idea why you're here, by the way?
>
> Blevins: No.
>
> The Court: Don't worry about it. . . .

The trial judge then compared the details of the two robberies as follows:

> ... Again, the physical resemblance is a subjective thing. Some might say there's a similarity and some might disagree. One might say that one's jaw is different and the nose is different and so on; otherwise, there's a six-week separation. It's a different bank, [albeit] across the street. It's a different time of day as between night and day. The robbery at Artisan[s]'[ ] was through a threatening note, and the robbery at the ATM was verbal. No sunglasses in the Artisan[s]'[ ] robbery. I think this is too attenuated.

After further argument, the trial judge concluded:

> ... Having pressed the issue, I do not think that the jawline of Mr. Blevins is the same as the jawline of the person in the [surveillance] photograph; but I did not make that part of my findings, because I do not want to make it appear that I'm judging the admissibility of this

evidence based on my subjective impressions of Blevins versus that photograph. So, I'm allowing for the possibility that the jury might actually see it differently than I did.

> \* \* \*

> ... [I]f there's a guilty verdict, you have leave within ten days longer, if you show cause, to supplement the record with whatever photographs you care to as to Mr. Blevins' appearance. . . .

Thereafter, Watkins testified. Watkins recalled that he became aware of the Flyer after Terranova spoke to Watkins' brother about it. Watkins explained that he viewed the Flyer and reacted: "To me, yes, it looked like me. That's what put me in shock immediately." But, Watkins testified that he did not commit the PNC Robbery. Watkins also testified that he was with a friend at the time that the PNC Robbery occurred. That friend also testified, but was unable to confirm Watkins' story.

The jury ultimately found Watkins guilty of robbery first degree and PFDCF. Thereafter, the trial judge sentenced Watkins. For the robbery first degree conviction, the trial judge sentenced Watkins to fifteen years imprisonment at Level V, suspended after three years for decreasing levels of supervision. For the PFDCF conviction, the trial judge sentenced Watkins to an additional three years imprisonment at Level V. This appeal followed.

### Discussion

■ Watkins contends that the trial judge abused his discretion in "precluding [his] proffer of exculpatory evidence to establish a reasonable doubt that someone else may have committed the crime for which [he] was charged." Specifically, Watkins argues that the trial judge erred in "imposing a stringent standard

of admissibility under [Delaware Rule of Evidence] 404(b), in effect requiring a 'signature crime' similarity between the two offenses in order to permit admission of the other crime evidence." We review the trial judge's ruling to exclude the Artisans' Robbery evidence for abuse of discretion.[1]

### Relevant Evidence

■■■ Evidence must be relevant to be admissible at trial.[2] Delaware Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We have explained that the definition of relevance encompasses materiality and probative value.[3] Evidence is material if the fact it is offered to prove is "of consequence" to the action.[4] Evidence has probative value if it "advances the probability" that the fact is as the party offering the evidence asserts it to be.[5]

Watkins' only defense at trial was misidentification. Consequently, the "central issue" or "ultimate fact" necessarily became the identity of the perpetrator.[6] Whether Daly and Terranova were mistaken was the material issue in this case. The Artisans' Robbery evidence had the potential to bolster Watkins' misidentification defense and was thereby "of consequence" to the trial. Given that the Artisans' Rob-

bery evidence was material, the question then becomes whether the evidence had probative value.

The details of the Artisans' Robbery differed from the PNC Robbery in many minor respects: the Artisans' Robbery occurred during the day, whereas the PNC Robbery occurred at night; the Artisans' Robbery involved the use of a threatening note, whereas the PNC Robbery was effected through the threat of a firearm; and the perpetrator in the Artisans' Robbery targeted a bank teller inside the bank, whereas the perpetrator in the PNC Robbery targeted a customer outside of the bank at the ATM. Nevertheless, the Artisans' Robbery and the PNC Robbery were unusually similar in other respects: the banks were located across the street from one another; the perpetrators fled into the same area; and the perpetrators were both white males and had similar builds. Given these similarities, we conclude that the Artisans' Robbery advanced the probability that someone other than Watkins had committed the PNC Robbery. Given that we conclude that the Artisans' Robbery evidence was material and had probative value, it was thereby relevant and admissible unless otherwise barred.[7]

### Probative Value Not Substantially Outweighed by Prejudicial Effect

■■ Delaware Rule of Evidence 402 relevantly provides: "All relevant evidence is

---

1. *Purnell v. State*, 979 A.2d 1102, 1106 (Del. 2009) (citing *Foster v. State*, 961 A.2d 526, 529 (Del.2008)).

2. *Stickel v. State*, 975 A.2d 780, 782 (Del. 2009) (citing D.R.E. 402).

3. *Id.* (citing *Lilly v. State*, 649 A.2d 1055, 1060 (Del.1994)).

4. *Id.*

5. *Id.*

6. *See Kiser v. State*, 769 A.2d 736, 740 (Del. 2001).

7. *See id.* at 741 ("It is sufficient if the evidence establishes that the fact sought to be proven, here the claim of misidentification, is more probable when supported by the proffered evidence that it would be without it.") (citing 1 McCormick on Evidence, § 185 (5th ed.1999)).

admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State." Delaware Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

We have explained that where a defendant invokes the defense of misidentification, "relevant misidentification evidence is highly probative of a material issue in the case." [8] Consequently, we must identify the potential prejudicial effect of admitting the Artisans' Robbery evidence and determine whether that prejudicial effect substantially outweighs the probative value of the Artisans' Robbery evidence.

There was at least one potentially prejudicial effect if Blevins took the witness stand: Blevins may have invoked his Fifth Amendment right not to incriminate himself, which could have misled the jury. We encountered that same legal issue in *Kiser v. State*.[9] There, the defendant's sole defense at his trial for drug charges was mistaken identity.[10] Specifically, the defendant attempted to establish that law enforcement officials often mistook him for one of his cousins or brothers on at least three occasions during the preceding ten years.[11] To demonstrate that fact, the de-

fendant attempted to call the following witnesses: his mother, a Superior Court bailiff, and his brother.[12] The trial judge did not allow any of those witnesses to testify.[13]

We reversed the trial judge's rulings. We concluded that the trial judge abused his discretion in excluding the testimony of the defendant's mother and the bailiff because their testimony would have been relevant to the defendant's claim of misidentification, and because the probative value of the evidence would not have been substantially outweighed by its prejudicial effect.[14] We were also troubled because the trial judge applied an incorrect standard—whether the probative value of the evidence was "outweighed by the danger of confusing the jury and the issues"—rather than the standard that the probative value be "substantially outweighed" by the dangers cited.[15]

We also examined the proffer of the defendant's brother, who indicated that he intended to invoke his Fifth Amendment right not to incriminate himself if asked any questions regarding the crimes for which the defendant was charged.[16] We explained that the brother's appearance and identification could lead the jury to infer that the brother was the perpetrator, but that his refusal to answer any questions other than his name and relationship to the defendant "would have precluded the State from effectively cross-examining

---

8. *Id.*

9. 769 A.2d 736 (Del.2001)

10. *Id.* at 738–39.

11. *Id.* at 738.

12. *Id.*

13. *Id.* at 739.

14. *Id.* at 740–42.

15. *Id.;* D.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.").

16. *Kiser,* 769 A.2d at 742.

him to dispel [that] inference...."[17] We concluded that the trial judge did not err in determining that the State would be unduly prejudiced if the defendant's brother was permitted to testify, given that two photographs of the defendant's brother were in evidence and available to the jury.[18] We also noted that an acceptable procedure on remand would be for the defendant's brother to be identified in court as an exhibit.[19]

The facts here are different from the facts of *Kiser*. The trial judge asked defense counsel if Blevins would invoke his Fifth Amendment right not to incriminate himself if permitted to take the witness stand. Defense counsel responded: "I would expect him not to admit that he's involved in the crime here." When Blevins was present in the courtroom, the trial judge did not ask Blevins if he planned to invoke his Fifth Amendment right. The record before us does not reflect that Blevins would have done so.

Even if Blevins definitively had asserted that he would take the witness stand and invoke his Fifth Amendment right not to incriminate himself, the Artisans' Robbery evidence could have been admitted in two other ways, which would have limited any prejudicial effect. In *Kiser*, we identified those options. First, the trial judge could have allowed defense counsel to present the jury with the facts of the Artisans' Robbery and photographs of Blevins.[20] Second, the trial judge could have allowed defense counsel to present the jury with the facts of the Artisans' Robbery and then have Blevins identified in court as an exhibit to avoid the concern that Blevins might invoke his Fifth Amendment right

not to incriminate himself.[21] If the trial judge had employed either of those methods, the probative value of the relevant Artisans' Robbery evidence would not have been substantially outweighed by the dangers of confusion of the issues or misleading the jury. Accordingly, the evidence was admissible.

As in *Kiser*, "[t]he claim of misidentification did not present a peripheral issue in this case—it was the core of the defense."[22] The exclusion of the Artisans' Robbery evidence deprived Watkins of the opportunity to pursue his sole defense. Because the trial judge erred in excluding that critical evidence, we must grant Watkins a new trial.

### Conclusion

The judgments of the Superior Court are **REVERSED** and the matter is **REMANDED** for a new trial consistent with this Opinion.